**In re the Marriage of Teresa A. WALKER, Appellant (Petitioner),**

v.

**Stephen D. WALKER, Appellee (Respondent).**

**No. 49A04–8807–CV–0025.**

Court of Appeals of Indiana, Fourth District.

June 21, 1989.

Teresa A. Shook, Indianapolis, for appellant.

Gale M. Phelps, Phelps & Fara, Indianapolis, for appellee.

MILLER, Judge.

Teresa A. Walker appeals the award of joint legal custody with respect to her daughter, Jessica (presently age 4), entered in conjunction with her divorce from Stephen D. Walker. We affirm.

*Issue*

Whether the court abused its discretion in entering an order of joint legal custody?

*Facts*

The largely undisputed facts indicate Teresa and Stephen were married on April 28, 1984. One child, Jessica, was born to the marriage May 20, 1985. Teresa moved out of the marital residence May 1, 1987 and filed for dissolution June 25, 1987. (Jessica was 2 years old at that time.)

At the contested final hearing of dissolution on March 4 and 22 of 1988, both parties asked for sole custody of Jessica. The court's dissolution decree provided for the joint legal custody of Jessica. Stephen got physical custody. He and Jessica will continue to live in the marital residence. Teresa is to pay $30.00 a week child support.

During the separation, the couple demonstrated an ability to cooperate concerning the care of Jessica. They had worked out amicable visitation and daycare arrangements without court supervision. They

presently live within 10 to 15 minutes (travel time) of each other.

Additional facts are supplied as needed.

### Decision

Child custody determinations fall squarely within the discretion of the trial court and will not be disturbed except for an abuse of discretion. *Brown v. Brown* (1984), Ind.App., 463 N.E.2d 310. On review, we will not reweigh the evidence, adjudge the credibility of the witnesses, nor substitute our judgment for that of the trial court. We will examine the evidence to determine if there is any evidence supporting the trial court's determination. We will not reverse unless we find the trial court's decision is against the logic and effect of the facts and circumstances before the Court or the reasonable inferences drawn therefrom. *Whitman v. Whitman* (1980), Ind.App., 405 N.E.2d 608.

IND.CODE 31–1–11.5–21 governs joint custody orders. It reads:

(a) The court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the best interests of the child, there shall be no presumption favoring either parent. The court shall consider all relevant factors including:

(1) The age and sex of the child;

(2) The wishes of the child's parent or parents;

(3) The wishes of the child;

(4) The interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interests;

(5) The child's adjustment to his home, school, and community; and

(6) The mental and physical health of all individuals involved.

\*　　\*　　\*　　\*　　\*　　\*

(f) The court may award legal custody of a child jointly if the court finds that an award of joint legal custody would be in the best interest of the child. As used in this section, "joint legal custody" means that the persons awarded joint custody will share authority and responsibility for the major decisions concerning the child's upbringing, including the child's education, health care, and religious training. An award of joint legal custody does not require an equal division of physical custody of the child.

(g) In determining whether an award of joint legal custody would be in the best interest of the child, the court shall consider it a matter of primary, but not determinative importance that the persons awarded joint custody have agreed to an award of joint legal custody. The court shall also consider:

(1) The fitness and suitability of each of the persons awarded joint custody;

(2) Whether the persons awarded joint custody are willing and able to communicate and cooperate in advancing the child's welfare;

(3) The wishes of the child and whether the child has established a close and beneficial relationship with both of the persons awarded joint custody.

(4) Whether the persons awarded joint custody live in close proximity to each other and plan to continue to do so; and

(5) The nature of the physical and emotional environment in the home of each of the persons awarded joint custody.

Teresa argues the court abused its discretion in awarding joint custody because the award is not in the best interests of the child and is contrary to law because it is not supported by the evidence. She argues:

[the transcript] is replete with acknowledgments of fights, disagreements, arguments, and general resentment toward one another. Teresa testified that Stephen had been physically abusive toward her and that he lost his temper often. Teresa testified that she was the chief caretaker of Jessica and that Stephen was gone much of the time. On the other hand, Stephen testified that Teresa had been abusive toward him and that she was short tempered. Stephen stated that he wouldn't trust Teresa with a gun.

Yet, he also testified that he had pushed her down and felt resentful toward Teresa and her boyfriend, David Hawk. Stephen testified that he had been the principal caretaker of Jessica and that Teresa was gone much of the time.

Both Teresa and Stephen testified that there were many disputes and arguments. They testified that they argued about when and where Jessica should be allowed to visit and that visitation had been denied. They argued about what time Jessica should be returned home and who should provide transportation. They could not agree on whether the child was sick and who should take her to the doctor. They disputed who was responsible for taking her to the dentist. The parties showed an inability to cooperate, even for the sake of the child. Appellant's brief p. 5.

A thorough examination of the record does not support Teresa's version of the facts. The trial court could easily have found some of the incidents alluded to of minor importance. Other incidents alluded to are materially misrepresented or have no basis in the record.

The record does indicate some incidents of violence. At the breaking point in the marriage (immediately before Teresa moved out), Teresa testified Stephen "jerked" her out of bed, "jerked" her through the hallway and "slung" her into the other bedroom "because he wanted to talk to me." The record indicates the following circumstances surrounding the incident: 1) It was five o'clock in the morning and Teresa had only been home a short time. She had been out on a date with the man she presently lives with. (The trial court could have appreciated Stephen's anger without condoning the use of violence.) 2) Teresa had been in bed with Jessica (the court could have found Stephen's desire not to argue with Teresa in Jessica's presence commendable.)

Teresa also testified, without contradiction, that on another occasion Steven had jerked her hair and had taken Jessica from her arms. Teresa and Stephen admit-ted that they had argued on other occasions in the past.

Teresa testified that, on one occasion during the separation, she had a problem picking Jessica up for her period of visitation (or returning her after her period was over—the record is unclear). This problem had arisen because she did not have transportation. Although she had at least one automobile available to her, she had a car pool arrangement with a co-worker to save money. Stephen testified that if there was a similar problem in the future he would pick Jessica up when it was time for her to come home.

Teresa testified about an occasion during the separation when she and Stephen had not agreed about Jessica's medical needs. The evidence most favorable to Teresa indicates that when she had dropped Jessica off at Stephen's house, she told him she thought Jessica should go to the doctor because she was sick. She thought Stephen would take Jessica to the doctor on his day off. When she returned to pick Jessica up, Jessica had not been to the doctor and was still sick. Teresa took Jessica to the doctor who treated her for an ear infection. Stephen testified that, at the time, he did not think Jessica needed to go to the doctor.

Stephen did testify he did not trust Teresa with a gun. But, this testimony is taken out of context. He was arguing he should be awarded a particular gun owned by the parties as part of the property settlement.

Teresa directed us to page 221 of the record to support her assertion (quoted above) that Stephen resents her and her boyfriend, David Hawk. Stephen's testimony on that page reads: "I can't forget her for what she's done but I have forgiven her. She's welcome to lead her own life. I wish her the best."

Very little law in Indiana has been decided concerning joint legal custody. In the New York case of *Dodd v. Dodd* (1978), 93 Misc.2d 641, 403 N.Y.S.2d 401, an award of joint custody was overturned. The court held the award was inappropriate because the parties had:

"made child rearing a battleground; agreement has been totally absent.... When one parent resists joint custody and refuses to be persuaded that it is workable what will be the result for the children when it is ordered by the court? [Even] the most ardent professional proponents of joint custody assume cooperation between parents and agreement about child rearing practices as basic requirements for joint custody." *Id.* 403 N.Y.S.2d at 405.

Similarly, in *Bashore v. Bashore* (1985), Mo.App., 685 S.W.2d 579, an award that resembled joint custody was overturned. The parents had very different lifestyles, religious beliefs and child rearing practices. The court held the arrangement was unlikely to succeed because the parties had not shown an inclination or ability to cooperate in important matters affecting the rearing of the children; the arrangement was against the wishes of both parents who expressed parental disagreement on fundamental issues of religious doctrine and child discipline.

However, in *Beck v. Beck* (1981), 86 N.J. 480, 432 A.2d 63, 17 ALR4th 997, a *sua sponte* award of joint custody (as in the case at bar where neither party requested joint custody) was affirmed. The court noted the concept of joint custody solves some of the problems of sole custody by providing the child with access to both parents and granting parents equal rights and responsibilities regarding their children. One problem of sole custody the court noted is, that because one parent "wins" and another "loses," the children are more likely to become the subject of bitter custody contests and post-decree tension. Finally, the court stated its opinion that, although joint custody may be less likely to succeed if ordered by the court than if achieved by the parents' agreement, court-ordered joint custody is likely to be no more prone to failure than court-ordered sole custody following a divorce custody proceeding. The *Beck* court went on to hold:

[t]he most troublesome aspect of a joint custody decree is the additional requirement that the parent exhibit a potential for cooperation in matters of child rearing. This feature does not translate into a requirement that the parents have an amicable relationship. Although such a positive relationship is preferable, a successful joint custody arrangement requires only that the parents be able to isolate their personal conflicts from their roles as parents and that the children be spared whatever resentments and rancor the parents may harbor. Moreover, the potential for cooperation should not be assessed in the 'emotional heat' of the divorce.

If the parents outside of the divorce setting, have each demonstrated that they are reasonable and are willing to give priority to the best interest of their child, then the judge need only determine if the parents can separate and put aside any conflicts between them to cooperate for the benefit of their child. The judge must look for the parents' ability to cooperate and if the potential exists, encourage its activation by instructing the parents on what is expected of them. *Id.* 432 A.2d at 71, 72 (citations omitted).

We are impressed by the *Beck, supra,* case and believe the application of its rationale is consistent with our law. In Indiana, an agreement to an award of joint custody is of primary importance in the trial court's determination. I.C. 31–1–11.5–21(g). However, an agreement to joint custody is not mandatory (determinative), the court shall consider various factors enumerated by statute and may award joint custody if it finds such an order is in the child's best interests. I.C. 31–1–11.5–21(f), (g).

Frankly, we are reluctant to affirm a trial court's order of joint custody when one of the parties objects thereto. Teresa, by appealing this case, makes clear her objections. On the other hand, the statute gives the trial court the discretion to award joint custody and we are just as reluctant to reverse a trial court's exercise of that discretion when the evidence does not show a clear abuse thereof by attempting to impose an intolerable situation upon two persons whose relationship has become a bat-

tleground.[1]

In the case at bar, one statutory factor is easily satisfied. The parties live in close proximity (10 to 15 minutes) of each other. I.C. 31-1-11.5-21(g)(4).

More importantly, Stephen and Teresa have demonstrated a willingness and ability to communicate and cooperate in advancing Jessica's welfare as required by I.C. 31-1-11.5-21(g)(2). Teresa testified that the relationship between Stephen, Jessica, and herself had been quite close. Even before the initial hearing at which the court made a provisional order of joint custody, Stephen and Teresa had worked out an amicable visitation arrangement. They demonstrated complete agreement concerning Jessica's daycare (babysitter) arrangement when both of them are working during the day.

Certainly, there was ample evidence that Stephen and Teresa had disagreements and arguments between themselves. (This is not unusual with divorcing couples.) But, nowhere in the record is evidence of fundamental differences in child rearing philosophies, religious beliefs, or lifestyles. No-where is evidence that child rearing became a battleground.

We acknowledge in a sensitive situation such as this that a more careful scrutiny of evidence is necessary. However, no evidence indicates a major obstruction in the willingness or ability of Stephen and Teresa to communicate and cooperate in advancing Jessica's welfare. On the contrary, they have demonstrated an ability to put aside their own differences in order to cooperate for Jessica's benefit.

The evidence supports the trial court's decision that an award of joint custody is in Jessica's best interests. We have no way of knowing whether this arrangement will work or not; only time can tell. We find no abuse of discretion requiring reversal.

Therefore, we affirm.

CHEZEM, BUCHANAN, JJ., concur.

---

1. Obviously, the statute is applicable in contested situations when the divorcing couple cannot reach an agreement. If the couple could craft their own agreement, there would be no need for the trial court to apply the statutory factors in determining whether joint custody was in the best interest of the child. However, the statute could also be invoked by the trial court to refuse to accept a couple's agreement of joint custody. Under rare circumstances, the court might determine, because the parents had made child rearing a battleground, that in spite of the couple's agreement, joint custody would not be in the child's best interest.