**In re the Marriage of Joan L. STUTZ, Appellant (Petitioner Below),**

v.

**Max E. STUTZ, Appellee (Respondent Below).**

**No. 32A01–8909–CV–366.**

Court of Appeals of Indiana, First District.

July 23, 1990.

Teresa A. Shook, Indianapolis, for appellant.

Robert A. Wood, Kendall, Wood, Coleman & Kessinger, Danville, Elmer E. Lyon, Spencer, for appellee.

ROBERTSON, Judge.

This appeal from a final decree of dissolution involves primarily four issues: (1) whether the trial court abused its discretion in dividing the marital property; (2) whether the trial court abused its discretion in awarding the parties joint legal custody of the minor child; (3) whether the trial court abused its discretion in ordering the wife to pay $100 per week child support into a trust for the benefit of the minor child; and (4) whether the trial court's order forbidding the parties to discuss the terms of the decree with the minor child denied the petitioner, Joan Stutz, her constitutional right to freedom of speech.

We affirm in part and reverse in part.

The Stutzes were married for twenty-two years, from November 6, 1965 until March 5, 1987, when they separated. Although they had two children, only one, Jennifer, is a minor and unemancipated. She was born on July 20, 1974 and at the time of the hearing on the dissolution petition, would have been a freshman in high school. The trial court issued its findings and decree of dissolution on March 24, 1989.

## I.

### Property Division

We should note first that the trial court did not assign a value to the parties' various assets. However, the cash value of many of the assets is not disputed. If we assume the trial court adopted the husband's valuation of the assets, given its finding that it did not attach any credit to the opinions of Joan's Stutz's accountant, Joan received approximately 24% of the parties' assets. Under this scenario, she received better than 50% of the equity in the residence, nearly all of the furniture which the husband valued at $30,000, all of her personal belongings for which no evidence of value was offered, the Mercedes sports car, her IRAs and jewelry. In addition, the trial court specifically awarded her certain tax refunds totaling $28,018 and a judgment of $363,000 for her portion of the business, an individual proprietorship known as Trim–Line of Stutz. Joan valued the business at $878,437 while Max Stutz valued it after losses sustained in 1988 at $558,775. The average of these values is approximately $718,000 of which $363,000 is roughly one-half.

Although not specifically stated, it appears Joan did not receive any portion of

the parties' savings accounts, including the Merrill Lynch account which contained the remaining proceeds from the sale of two-thirds of the business in 1986. According to the husband, the Merrill Lynch account contained approximately 1.4 million dollars at the time of the hearing. The evidence showed that the business sold in December 1986, three months before the petition for dissolution was filed, for approximately 2.5 million dollars. The then corporation had assets worth approximately $95,000, the remaining portion of the sale price attributable to goodwill and Max's expertise. The parties had better than $65,000 in the other savings accounts. Max also retained three vehicles with a total value of $28,000, his life insurance and IRAs which again were worth considerably more than Joan's.

Joan contests the property division on the basis that the trial court considered the evidence of her dissipation of the marital assets to the exclusion of the factors specified in I.C. 31–1–11.5–11. However, the trial court's findings and the evidence of record establish that the trial court did consider the contributions of each of the spouses to the acquisition of property, the economic circumstances of each spouse, the conduct of the parties during the marriage and the earnings and earning ability of each spouse but did not place substantial weight on either Joan's contribution as a homemaker or her contention that she did not have the ability to earn much. Indeed, the trial court specifically found that the evidence rebutted the presumption that she was entitled to an equal share in the marital estate. Briefly, the findings and evidence on each factor are as follows:

(1) *The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.*

The trial court found the evidence "clearly proved that the overwhelming majority of the assets and liabilities of this marriage were earned and accumulated by Max's work in his Trim–Line business and its sale to the 3M Company in December 1986." This finding is substantiated by the record. Max purchased the trim line franchise in

1974. The business grew at a rate of about 300% per year.

The evidence also showed that the Stutzes married when they were both nineteen. They had high school educations. Max worked two jobs continuously over the twenty-two year marriage. He contributed all of the income. Joan was a good homemaker over the first sixteen years of the marriage but lost interest in the home and family in the final six years. Joan did work at the business as a receptionist as her schedule permitted. She also handled accounts receivable until the business incorporated in 1984 and computerized. Two employees, in addition to Max, testified that Joan's presence in the office was a hindrance. She made the other employees uncomfortable and actually cost the business customers.

(2) *The extent to which the property was acquired by each spouse prior to the marriage or through inheritance or gift.*

Neither party brought much in assets into the marriage. Joan contributed $500 while Max owned a vehicle. Neither party made any claim or introduced any evidence of inheritance or gift.

(3) *The economic circumstances of each spouse at the time the disposition of the property is to be effective, including the desirability of awarding the family residence or the right to dwell in that residence for such periods as the court may deem just to the spouse having custody of any children.*

The trial court awarded Max the residence and physical custody of the minor child but ordered him to pay Joan $52,500, a sum representing one-half of Joan's appraisal of the home's value and better than half of Max's. The parties purchased the home for $40,000. Max improved the home with an addition to accommodate his older daughter, son-in-law and grandchild. The improvements were made from his income after Joan left.

The court specifically indicated that it had considered Joan's economic circumstances:

Joan wants substantially more than fifty percent (50%) of the assets of the mar-

riage because of the contribution she says she made to the marriage, the fact that she is 42 years old, a high school graduate, no computer training, and has no benefits at her current work such as retirement or medical, because she can't earn much, and will have to live off any property division from this marriage while she only makes Six Dollars ($6.00) an hour and cannot find a job for more money and cannot make a lot of money.

The court also recognized in its findings the disparity in the parties' incomes. Joan grosses $180 per week while Max has a gross income of about $3500 per week. Max retained a part of the trim business after the sale but the business has been losing money in recent years. Max also had as a consequence of the sale of the business a two-year consulting contract with 3M which expired before the final hearing on this matter, has the ability to earn a commission for two more years on gross sales, and has signed an agreement not to compete for which he is compensated. In addition, he will continue as an audio-visual technician with the Indianapolis School Board, a position which he has held for several years.

We note in addition that Joan's financial circumstances have been greatly improved by Max who agreed to maintain her with a payment of $3,000 per month pending final dissolution, maintained her car and provided her with a down payment for a condominium. In addition, Max is paying for $3,000 worth of dental work Joan had done in early 1987, her psychiatric and cosmetic surgery costs incurred before she left, and paid for the older daughter's wedding without Joan's assistance. Joan, on the other hand, has continued to incur consumer debt including the purchase of a Rolex watch which has necessitated that she borrow $10,000.

(4) *The conduct of the parties during the marriage as related to the disposition or dissipation of their property.*

The trial court found with respect to this factor that "Joan dissipated the financial, business and emotional assets of the marriage by proliferate spending, casual indif-

ference to the realities of the business world …"

Much of the evidence is dedicated to Joan's dissipation of the marital assets and her indifference to the consequences. When the business was sold in 1986, Max paid off approximately $29,250 in consumer debt, 85–90% of which Joan incurred. Finance charges on credit cards amounted to nearly $6,000 in 1986. In 1986, Joan bounced 47 checks; overdraft charges totaled $564 in that year. In the first three months of 1987, before Joan left, she had 24 checks returned because of insufficient funds. Max discussed the implications of their extended personal financial circumstances on the business with Joan but she refused to curtail her spending. Max would deposit as much as $1000 at a time without Joan's knowledge yet she would still overdraw. Seventy percent of her spending was on herself.

(5) *The earnings or earning ability of the parties as related to a final division of property and final determination of the property rights of the parties.*

Much of the evidence relevant to this consideration has already been discussed. Despite Joan's inability to manage money, Max showed a great deal of responsibility as a business person and is regarded by bank officials as a very good bank customer. He is instrumental to the success of the trim business. He can earn as much as he chooses.

■ Hence, contrary to Joan's assertions, the findings and record favor the presumption that the trial court considered all of the factors listed in IND.CODE 31–1–11.5–11 in dividing the marital property. *Cf. Wilson v. Wilson* (1980), Ind.App., 409 N.E.2d 1169, 1174. The evidence establishes a rational basis for the trial court's conclusion that Joan was not entitled to an equal share of the assets. In short, it shows that during the period when Max was building the goodwill of the business, the corporation's primary asset, Joan was not only not contributing to the business's success, she was disposing of the parties' personal assets at a phenomenal rate without regard to the consequences of her ac-

tions on the business. The trial court gave Joan a share in the marital home to which she contributed and permitted her to keep interests in other assets acquired during the course of the marriage including an equal share in the original business. She will take with her several IRAs. However, the trial court determined it fitting that having failed to contribute positively to either the parties' savings or the goodwill of the business as it existed in 1986, she not take an interest in either. This result is not against the logic or effect of the facts and circumstances before the court. The fact that the court did not give as much weight to Joan's lack of employment and marketable skills as she felt she deserved is insufficient to establish an abuse of discretion. *Lord v. Lord* (1982), Ind.App., 443 N.E.2d 847, 851.

■ Joan also contests that portion of the trial court's order requiring her to pay the attorney and professional fees incurred when she was represented by Gaddy & Gaddy and directing Max to draw checks payable to those parties and deduct those amounts from the cash installment due Joan. The court ordered Max to pay all other fees incurred by Joan including all trial, deposition and appraisal costs.

I.C. 31–1–11.5–16 affords the trial court broad discretion in assessing attorney fees and costs of litigation. *Hawblitzel v. Hawblitzel* (1983), Ind.App., 447 N.E.2d 1156, 1164. The evidence of record exhibits a rational basis for the trial court's directive. When represented by Gaddy & Gaddy, Joan refused to permit her attorneys to take steps to obtain materials requested of Max through discovery. As a consequence, they withdrew from the case, necessitating the hiring of new attorneys and some overlap in expenses. Furthermore, Joan's propensity for consumer goods has been aptly demonstrated. It was therefore reasonable for the trial court to secure payment from funds coming to Joan.

## II.

### Joint Legal Custody

■ Joan maintains that the trial court failed to follow the statutory guidelines for awarding joint legal custody. She describes the evidence as showing rancor and hostility between the parties and points to the trial court's order that the parties comply with the terms of "Parents are Forever," an attachment to the court's order, as indicative of the court's recognition of their inability to cooperate as parents. In the absence of the parties' express agreement and based upon this record, Joan contends that the award of joint legal custody is an abuse of discretion.

I.C. 31–1–11.5–21(f) authorizes a trial court to award legal custody jointly if it finds that such an arrangement would be in the best interest of the child. In determining whether an award of joint custody would be in the best interest of the child, I.C. 31–1–11.5–21(g) requires the court to consider it a matter of primary, *but not determinative* importance, that the persons awarded joint custody have agreed to such an award. In addition, the trial court must consider:

(1) the fitness and suitability of each of the persons awarded joint custody;

(2) whether the persons awarded joint custody are willing and able to communicate and cooperate in advancing the child's welfare;

(3) the wishes of the child and whether the child has established a close and beneficial relationship with both of the persons awarded joint custody;

(4) whether the persons awarded joint legal custody live in close proximity to each other and plan to continue to do so; and

(5) the nature of the physical and emotional environment in the home of each of the persons awarded joint custody.

The trial court found both parents to be fit and proper persons to have legal custody of the sixteen-year-old daughter Jennifer, placing physical custody of the child, subject to Joan's visitation, in Max so long as he continues to reside in the family residence in Danville and Jennifer attends the Danville community schools. The trial court however did not offer any additional factual findings with respect to the statu-

tory considerations recited above. I.C. 31-1-11.5-21 requires only that the court consider all relevant factors in awarding custody. In the absence of a request for specific findings pursuant to Ind.Trial Rule 52(A), a custody determination based upon this section will be reversed only if it is clearly against the logic and effect of the facts and circumstances before the court or the reasonable inferences to be drawn therefrom. *In re the Marriage of Ford* (1984), Ind.App., 470 N.E.2d 357, 363, *trans. denied. See also Walker v. Walker* (1989), Ind.App., 539 N.E.2d 509, 510.

Contrary to Joan's rendition of the evidence, the record contains no evidence of hostility between the parties, other than on Joan's part, and no disagreement whatsoever over matters related to Jennifer's upbringing. In fact, the record contains an agreed entry temporarily placing physical custody of Jennifer with Max with the parties sharing legal custody of her. Apparently, this arrangement worked out well in the days preceding the dissolution. Joan would pick Jennifer up at school and bring her home later in the evening. Max never interfered with this arrangement.

For a time, Max and Jennifer moved to Bardstown, Kentucky because Jennifer wanted to be closer to her sister. On the weekends she would fly back to Indianapolis and meet her mother. Max cooperated in bringing Jennifer back for visitation. When Jennifer decided she preferred the Danville schools to those in Kentucky, Max moved the family back to Danville. Hence, the Stutzes have demonstrated the proximity of the parents to each other is not a particularly weighty factor when it comes to Jennifer's interests.

Max and Joan are of the same religious affiliation although Joan has been "disfellowshipped" and is in the process of mending relations with her church. While Jennifer and Max disagree about religious matters, there is no evidence in the record that Max and *Joan* disagree over the same issues.

Lastly, the record supports the conclusion that either home would be emotionally beneficial for Jennifer. Jennifer expressed a preference to live with her mother and has been raised primarily by her mother. Joan testified that she had a close and loving relationship with Jennifer and they communicated well. On the other hand, the record shows that Max is willing to put Jennifer's interests before his business. His other daughter and her family were residing with him in Danville at the time of the final hearing.

Joan's brief suggests that the trial court failed to consider Jennifer's wishes as reported through her guardian ad litem. However, the guardian ad litem reported only that Jennifer had valid reasons for her preference. Given that there was evidence on the record on each of the statutory factors, we are not prepared to find that the trial court failed to consider the guardian ad litem's report. The trial court might have assessed greater weight to Jennifer's point of view had he known the basis of her opinion.

### III.

### Child Support

The trial court ordered Joan to pay through the clerk of the court $100 per week toward the support of Jennifer, the $100 payment thereafter to be accumulated in a trust for Jennifer with disposition to be made to Jennifer on her twenty-first birthday. Should Jennifer die before then, the proceeds of the trust would revert to Max. Joan challenges both the amount of support and the trial court's authority to order that payments be made into a trust.

Joan concedes that she has an obligation to support her minor daughter but complains that the $100 per week ordered is exorbitant since she has net pay of only $117 per week and she spends as much time with her daughter as Max does. Moreover, Max can more than adequately support Jennifer without her contribution; therefore, the amount ordered is not tied to Jennifer's needs.

Based solely upon the parties' gross income, the $100 payment is over six times that recommended by the Judicial Reform Committee through its child support guide-

lines.[1] *See* I.C. 31–1–11.5–12. However, I.C. 31–1–11.5–12(a) directs the court to consider the financial resources of the custodial and noncustodial parent, not solely income from employment. This means the financial position of the parents after dissolution and distribution of the marital assets. *In re the Marriage of Saunders* (1986), Ind.App., 496 N.E.2d 419, 423. In addition, the figure derived from the child support guidelines does not take into account the trial court's order that Max pay all of Jennifer's medical expenses and maintain a policy of medical, dental, optical and prescription insurance.

The record shows that Joan's expenses are about $2750 per month. She received a property settlement of about $544,000. Of that, $80,500 will be in cash. She will receive monthly installments of $3,000 which will continue for a substantial period of time after her obligation to support Jennifer ceases. This is simply not a case, like *Saunders*, where the support order impoverishes the wife to the benefit of the husband.

The trial court had before it evidence of both parties' financial resources, standards of living, needs, and the lifestyle Jennifer would have enjoyed had the marriage not been dissolved. There is little evidence of Jennifer's educational needs. Even so, we are not persuaded that the amount ordered when considered with the totality of other evidence before the court is either oppressive or an abuse of discretion. Child support should be based on the needs of the children, but those needs must be considered in light of all the circumstances in the case. A child has a right to be supported in a style consonant with the societal position of her parents. Where the circumstances warrant, a child is entitled to more than just the bare necessities of life. *Halum v. Halum* (1986), Ind.App., 492 N.E.2d 30, 33, *trans. denied. Cf. also Allen v. Allen* (1985), Ind.App., 477 N.E.2d 104.

I.C. 31–1–11.5–14(a) permits a trial court upon entering an order for payment of child support to direct the clerk "upon the proper showing that a person other than the person awarded custody under Section 21 ... should receive payments" to transmit those payments to a trustee appointed by the court. The payments are to be used solely for the benefit of the child entitled to receive the payments. I.C. 31–1–11.5–14(b).

■ I.C. 31–1–11.5–14 unequivocally authorizes trial courts to order that child support be paid into a trust. The question then is whether on this record there has been a showing that a person other than Max should receive the payments.

Although the record contains a substantial amount of evidence that Joan is irresponsible with money and lives beyond her means, there is no evidence that Max is incapable of receiving support payments on Jennifer's behalf or that it is necessary to secure her funds in this manner. To the contrary, Max's consulting contract with 3M suggests that Max is extremely talented at managing the financial interests of others. Business associates view Max as a man of integrity and financially astute. To the extent then that I.C. 31–1–11.5–14 requires a showing of Max's lack of fitness to manage Jennifer's money, a proper showing has not been made and the trial court exceeded its authority in transferring the funds to a third person.

Furthermore, as we have often observed in assessing an award of child support, the needs of the child are of primary concern. *Beeson v. Beeson* (1989), Ind.App., 538 N.E.2d 293; *Hunter v. Hunter* (1986), Ind. App., 498 N.E.2d 1278. This principle applies with equal force to the method of payment. Whether a child will be in need of additional support is not contingent upon a child's age but upon the child's changing needs.

■ The method of disbursement chosen here bears no relation to Jennifer's actual

---

1. Based upon the guidelines, the basic child support obligation of both parties is $330.45 per week. We arrived at this figure by taking the natural log (lnx) of the parties' combined gross income, multiplying it by 89.42443 and subtracting 411.24 from that figure. Joan's income is approximately 4.9% of their combined incomes.

need. It provides neither on-going sustenance nor security for her during her minority, *cf. Allen v. Allen* (1985), Ind. App., 477 N.E.2d 104 (life insurance policy naming child as beneficiary assures continued support upon death of noncustodial parent), at least two of the purposes intended to be furthered by I.C. 31–1–11.5–14. Payments made by the noncustodial parent are not being used for the minor child's benefit if they are not received by the child until she is an adult and presumptively capable of supporting herself. Consequently, though we recognize broad discretion in the trial court to determine how a minor child will be provided for by divorcing parents, *id.* at 107, the trust ordered here cannot be sustained because we can find no rational purpose, based upon this record, for directing that support of the child be made in this manner. In addition, as we noted above, we find no showing in the record of a need to transfer oversight from Max to a third person.

### IV.

### Violation of First Amendment, Ind. Constitution, Art. I, § 9

Other than quoting the constitutional provisions at issue and the trial court's order, Joan has not developed an argument on this issue. We will not become an advocate for a party nor will we address arguments which are not developed. Constitutional challenges are deemed waived on appeal on the basis of Ind. Appellate Rule 8.3(A)(7) when made without the benefit of argument or citation to authority. *See Ogle v. St. John's Hickey Memorial Hospital* (1985), Ind.App., 473 N.E.2d 1055, *trans. denied. See generally Whisman v. Fawcett* (1984), Ind., 470 N.E.2d 73, 80; *Terpstra v. Farmers & Merchants Bank* (1985), Ind.App., 483 N.E.2d 749, 753.

We note however that the trial court's order precluding the parties from discussing the property division and trust with Jennifer indicates that it will be enforced

by *direct* contempt. Wilful disobedience of a court order constitutes indirect contempt, for which a defendant must be given a reasonable and just opportunity to purge oneself.[2] The trial court's order should therefore be amended to correct the misstatement.

Judgment affirmed in part and reversed and remanded in part with instructions to delete that part of the decree which refers to the trust, to make the support payable through the clerk's office, pursuant to I.C. 31–1–11.5–13, and to correct that part of the judgment referring to direct contempt.

BAKER, J., concurs.

GARRARD, J., concurs in part and dissents in part with separate opinion.

GARRARD, Judge, concurring in part and dissenting in part.

I concur with the majority except in its treatment of the $100 per week the court ordered the wife to pay into trust for the benefit of the daughter when she reaches her twenty-first birthday.

As the majority appropriately recognizes, the ordered arrangement cannot be said to constitute support for a minor child. Nor can it be supposed that the trial judge thought it was. It was rather clearly, I think, simply a device imposed to insure that despite the wife's profligate spending, the daughter would realize a tangible benefit from the property settled upon her mother. As such, the device was not authorized by law and cannot stand.

I would therefore treat as presently superfluous the question of how much the wife might have been ordered to contribute for support. Instead I would reverse that portion of the order and remand for a new hearing to establish the support obligations of the parties.

---

2. I.C. 34–4–7–3 provides:

Every person who shall be guilty of wilful disobedience of any process, or any order lawfully issued by any court of record, or by the proper officer thereof, under the authority of law, or the direction of such court, after the same shall have been served upon him, shall be guilty of an indirect contempt of the court from which such process or order shall have issued.