**In re the Marriage of: Anne Marie McGINLEY–ELLIS, Appellant–Petitioner,**

v.

**Charles R. ELLIS, Appellee–Respondent.**
No. 49A02–9303–CV–135 [1].

Court of Appeals of Indiana, First District.

Oct. 19, 1993.

---

**1.** This case was transferred to this office on August 10, 1993, by direction of the Chief Judge.

Nancy L. Cross, Miroff, Cross, Ruppert & Klineman, Indianapolis, for appellant-petitioner.

Bruce M. Pennamped, Lowe Gray Steele & Hoffman, Indianapolis, for appellee-respondent.

ROBERTSON, Judge.

Anne Marie McGinley–Ellis [Anne] appeals several portions of the decree which dissolved her marriage to Charles R. Ellis [Charles]. We reverse the property settlement and child support portions of the decree and remand with instructions. In all other respects, we affirm.

### FACTS

The facts in the light most favorable to the trial court's judgment indicate that Anne and Charles were married on July 26, 1985. Two children were born of the marriage, Catherine (born August 29, 1987), and Serita (born November 25, 1988). The petition for dissolution was filed on November 9, 1990.

The net marital estate was worth approximately $231,000.00. The trial court awarded Charles property worth approximately $200,500.00 and awarded Anne property worth approximately $30,500.00 for an approximate 87–13 division of the net marital estate in Charles' favor. However, the trial court's findings purport to divide the property 60–40 in favor of Anne.

The largest marital asset was the stock in Charles' family's business, the Paint and Auto Supply Corporation [PASCO], an Indiana corporation engaged in the business of selling automotive paint and painting supplies. PASCO was established by Charles' father and partner in 1959. Charles worked for PASCO in the summers throughout his childhood. Charles left college in 1979 when his father asked him to work at PASCO full-time toward the end of eventually assuming ownership of PASCO. Charles became the primary operating officer in 1983 after his father suffered a heart attack. During the marriage, Charles was elevated to president of PASCO and worked long hours at PASCO, often not returning from work until well after the children were in bed.

At the time the parties were married, Charles owned 22 shares of PASCO stock. During the marriage, Charles' parents gave him an additional 140 shares of stock. The shares were transferred over time in order to lessen the parents' federal gift and estate tax liability. Charles' parents testified at trial that Charles had received the stock as a result of his efforts on behalf of the business and that Charles' siblings had received no stock since they had not worked in the business. Charles admitted that he had begun working in the business full-time with the express intention of ultimately acquiring ownership of PASCO through his efforts.

Charles concedes that the 162 shares of PASCO stock in the marital pot are worth approximately $190,000.00. However, the trial court valued the PASCO stock in the marital estate at $9,331.00 representing the appreciation in value of the 22 shares that Charles brought into the marriage.

Charles requested the court to award the parties joint legal custody of the children with primary physical custody in Anne. Anne requested sole legal custody. The trial court awarded the parties joint legal custody with primary physical custody in Anne.

Charles derives his income from the operation of PASCO. For the purposes of computing the child support award resulting from an application of the guidelines, the trial court found that Charles' income consisted of his salary from PASCO ($814.00 per week) plus the "in kind" compensation of PASCO's provision of a truck for Charles' use ($93.00 per week). This income analysis translates into an annual income of $47,169.00 per year. Anne is not employed outside the home: the trial court imputed some income to her. The trial court found that the child support award resulting from an application of the guidelines was $200.00 per week. The trial court ordered Anne to execute IRS Form 8332 in order to waive the dependency tax exemptions in favor of Charles "for all future years."

Additional facts are supplied as necessary.

## DECISION

### I.

### PROPERTY DISTRIBUTION

 When reviewing a claim that the trial court improperly divided marital property, we must decide whether the trial court's decision constitutes an abuse of discretion. *Van Riper v. Keim* (1982), Ind. App., 437 N.E.2d 130. We consider only that evidence most favorable to the trial court's disposition of the property. *Benda v. Benda* (1990), Ind.App., 553 N.E.2d 159, *trans. denied.* We presume the trial court followed the law and made all the proper considerations in making its decision. *White v. White* (1981), Ind.App., 425 N.E.2d 726. We will reverse only if there is no rational basis for the award, that is, if the result is clearly against the logic and effect of the facts and the reasonable inferences to be drawn therefrom. *In re Marriage of Salas* (1983), Ind.App., 447 N.E.2d 1176.

 Indiana Code 31–1–11.5–11, governing property distributions in contested divorces, reads as follows:

(b) ... the court shall divide the property of the parties, whether owned by either spouse prior to the marriage, acquired by either spouse in his or her own right after the marriage and prior to final separation of the parties, or acquired by their joint efforts, in a just and reasonable manner, ...

(c) The court shall presume that an equal division of the marital property between the parties is just and reasonable. However, this presumption may be rebutted by a party who presents relevant evidence, including evidence concerning the following factors, that an equal division would not be just and reasonable:

 (1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.

(2) The extent to which the property was acquired by each spouse prior to the marriage or through inheritance or gift.

(3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the residence or the right to dwell in that residence for such periods as the court may deem just to the spouse having custody of any children.

(4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.

(5) The earnings or earning ability of the parties as related to a final division of property and final determination of the property rights of the parties.

Following the legislative adoption of the equal division presumption, we placed the requirement upon trial courts, when effecting an unequal division of marital property, to state the reasons based on the evidence which establish that an equal division is not just and reasonable. *In re Marriage of Davidson* (1989), Ind.App., 540 N.E.2d 641. However, our supreme court has held that express trial court findings will not be compelled for insubstantial deviations from

precise mathematical equality. *Kirkman v. Kirkman* (1990), Ind., 555 N.E.2d 1293.

■ At the outset, we note that the present deviation from equality amounts to approximately $84,811.00 ($231,000.00/2 − $30,688.94 = $84,811.06). As noted above, the property was divided 87–13 in favor of Charles ($200,500.00/$231,000.00 = .868). This is not an insubstantial deviation from precise mathematical equality. See *Hoskins v. Hoskins* (1993), Ind.App., 611 N.E.2d 178. Thus, we must analyze the sufficiency of the trial court's findings justifying the unequal division of marital property. *Id.*

■ Charles requested the trial court to make findings pursuant to Ind.Trial Rule 52. The purpose of making special findings is to provide parties and reviewing courts with the theory upon which the judge decided the case so that the right of review might be preserved effectively. *Willett v. Clark* (1989), Ind.App., 542 N.E.2d 1354; *Sandoval v. Hamersley* (1981), Ind.App., 419 N.E.2d 813, *trans. denied.* Whether special findings are adequate depends upon whether they are sufficient to disclose a valid basis under the issues for the legal result reached in the judgment. *Willett,* 542 N.E.2d at 1357. On appeal, we construe the trial court's findings together liberally in support of the judgment; however, we may not add anything to the special findings of fact by way of presumption, inference, or intendment. *Sandoval,* 419 N.E.2d 813. In reviewing the trial court's entry of special findings, we neither reweigh the evidence nor reassess the credibility of witnesses. *Flansburg v. Flansburg* (1991), Ind.App., 581 N.E.2d 430, *trans. denied.* Our T.R. 52(A) standard of review for trial court findings pertaining to a property distribution under I.C. 31–1–11.5–11 has been stated as follows:

> [W]here, as here, the outcome is not mandated by an established rule of law but, instead, the decision rests within the discretion of the court, *we must reverse* if the decision is not consistent with the findings and conclusions or *if the reasons given are insufficient as a matter of law to justify the manner in which the court exercised its discretion.* The reason arises from the fact that the court does have discretion. If the reason given by the court is not a valid basis for a particular exercise of discretion, it can be no more than conjecture on our part once the court recognizes the invalidity of its original reason it will reach precisely the same exercise of discretion for other reasons.... Similarly, if the findings and conclusions entered by the court, when construed most favorably toward the judgment, are nevertheless clearly inconsistent with it, the decision must be set aside regardless of whether there was evidence adduced at trial which would have been sufficient to sustain the decision. To hold otherwise would negate the primary purpose of special findings.

*Wilson v. Wilson* (1980), Ind.App., 409 N.E.2d 1169, 1174 (Emphasis in original; quoting *In re Marriage of Miles* (1977), 173 Ind.App. 5, 9, 362 N.E.2d 171, 174).

In the present case, the trial court found that Charles rebutted the presumption that an equal division of the marital property was just and reasonable "as it related to the gifted shares" of PASCO stock based on the fact that 140 shares were given to Charles by his parents during the marriage, citing I.C. 31–1–11.5–11(c)(2). (Finding 40) The trial court found that the value of the PASCO stock was disputed "based on whether the gift of stock was intended to be to Husband and Wife or to Husband only." (Finding 34) The trial court then found that the value of the stock in the marital estate was $9,331.00, representing the appreciation in value of the 22 premarital shares over the course of the marriage. (Finding 46)

■ The trial court has broad discretion in ascertaining the value of marital property and such valuation will not be disturbed absent an abuse of that discretion. *Neffle v. Neffle* (1985), Ind.App., 483 N.E.2d 767, *trans. denied.* No abuse of discretion in ascertaining the value of marital property will be found if the valuation is supported by sufficient evidence. *Id.* However, when no evidence supports the

value of marital property assigned by the court, we must find an abuse of discretion. *Axsom v. Axsom* (1991), Ind.App., 565 N.E.2d 1097.

Charles concedes that the PASCO stock in the marital estate is worth approximately $186,500.00. The trial court found that the fair market value of the 247 outstanding shares of PASCO was $284,429.00. (Finding 39) Thus, the fair market value of the 162 shares in the marital pot is approximately $186,548.57 ($284,429.00/247 = $1151.53 per share; $1151.53 × 162 shares = $186,548.57).

The trial court's $9,331.00 valuation of the PASCO stock in the marital estate is clearly erroneous and constitutes an abuse of discretion. While the extent to which the property was acquired by Charles before the marriage or through inheritance or gift may serve to rebut the 50–50 presumption of an equal split under I.C. 31–1–11.5–11(c)(2), it is axiomatic that the source of the stock has no impact upon its value.

The trial court found that Anne had made substantial contributions to the marriage due to her work as a homemaker (Finding 42) and that the present and future earning capacity of the parties was disparate in that Charles' present and future ability to earn through his business was greater than Anne's. (Finding 44)

Thus, the trial court found that the 50–50 statutory presumption of an equal division of marital property was rebutted (Finding 44) and then purported to effect a 60–40 division in favor of Anne of a marital estate worth approximately $51,000.00. (Finding 46) However, as noted above, the trial court actually effected an 87–13 division in favor of Charles because the trial court's plan of distribution did not include approximately $180,000.00 worth of PASCO stock. The trial court's findings which effect its property distribution scheme are ambiguous because it is impossible to discern which party rebutted the statutory presumption. Thus, the trial court's findings are insufficient to effectively preserve the right of review because they fail to disclose the legal basis for the legal result reached in the judgment. *Willett*, 542 N.E.2d at 1357.

Moreover, while the trial court found that the PASCO stock was subject to distribution, its valuation of the PASCO stock in the marital pot as including only the appreciation in value of the 22 premarital shares has effectively and systematically excised approximately $180,000.00 in property from the marital pot. This scheme violates the "one pot" theory preserved by I.C. 31–1–11.5–11(b). *Huber v. Huber* (1992), Ind.App., 586 N.E.2d 887, *trans. denied; Wilson*, 409 N.E.2d at 1173. A systematic exclusion of marital assets from the marital pot constitutes an abuse of discretion. *Wilson*, 409 N.E.2d at 1175. The plan of distribution in the present case is remarkably similar to the erroneous distribution in *Wilson* where the trial court systematically excised any portion of the marital assets which was attributable to a gift or an inheritance from the husband's parents. *Id.* at 1174. While the extent to which the property was acquired by Charles before the marriage or through inheritance or gift may serve to rebut the 50–50 presumption of an equal split, I.C. 31–1–11.5–11(c)(2), the entire value of the PASCO stock must be included in the marital pot and divided by the trial court under I.C. 31–1–11.5–11(b).

For the above mentioned reasons, the trial court's findings do not sufficiently support its plan of distribution under T.R. 52. We, therefore, remand this case to the trial court with directions to include the entire undisputed value of the 162 shares of Charles' PASCO stock in its plan of distribution and either follow the statutory presumption and effect an equal division of the marital property, or set forth its rationale for not doing so. See *Davidson*, 540 N.E.2d at 646.

II.

CHILD SUPPORT

Anne argues that the trial court erred in calculating Charles' income for purposes of computing his child support obligation un-

der the Indiana Child Support Guidelines. We agree.

In general, child support is within the sound discretion of the trial court. *Cox v. Cox* (1991), Ind.App., 580 N.E.2d 344, *trans. denied.* Such determinations will not be disturbed on appeal unless they are against the clear logic and effect of the facts and circumstances before the court. *Id.* In reviewing a determination of child support, we will not reweigh the evidence or judge the credibility of witnesses. *Id.* On review, it is the financial resources of both parents, as well as the standard of living the children would have enjoyed had the marriage not been dissolved, that are the relevant inquiries. *Id.*

As noted above, as president and majority stockholder, Charles' income is derived from the operation of PASCO. The trial court found that Charles controls his compensation from PASCO. Under the guidelines, a parent's income derived from the operation of a business is defined as:

> gross receipts minus ordinary and necessary expenses. Specifically excluded from ordinary and necessary expenses for purposes of these Guidelines are depreciation, investment tax credits, or any other business expense determined by the Court to be inappropriate for determining weekly gross income for purposes of calculating child support. In general, these types of income and expenses from self-employment or operation of a business should be carefully reviewed. In most cases, this amount will differ from a determination of business income for tax purposes.
>
> Expense reimbursements or in-kind payments received by a parent in the course of employment, self-employment, or operation of a business should be counted as income if they are significant and reduce personal living expenses. Such payments might include a company car, free housing, or reimbursed meals.

Ind.Child Support Guideline 3.A.2. In the case of a self-employed person or a person engaged in the operation of a business, the guidelines require the trial court to careful-

ly scrutinize the parent's financial situation, and to exclude as a business expense any expenditure which the court in its discretion finds will personally benefit the parent. *Merrill v. Merrill* (1992), Ind.App., 587 N.E.2d 188, 190. The economic advantages available to the parent who operates a business, including the availability of a line of credit for the payment of personal expenses and the tax advantages accruing from the operation of a business, are relevant considerations in computing the payor parent's income under the guidelines. *Cox,* 580 N.E.2d at 351. Depreciation is not a deduction from weekly income for purposes of calculating child support. *Id.;* Child Supp.G. 3.A.2.

In the present case, the trial court's calculation of Charles' income included only his salary from PASCO ($814.00 per week) and the "in kind" compensation of the use of a truck ($93.00 per week). In effect, the trial court treated Charles as an employee of PASCO, not the president/majority stockholder in complete control over his compensation as well as every other operational aspect of the business. Thus, the methodology employed by the trial court in calculating Charles' income fails to comport with the methodology prescribed by Child Supp.G. 3.A.2. as set out above and constitutes an abuse of discretion.

One important consideration, however, is that Charles is not the sole shareholder of PASCO. Although he presently owns a 66% interest in PASCO and expects to be given more stock over time under the gifting program discussed under Issue I, the trial court should take the minority shareholder's interests in PASCO into consideration in calculating Charles' income derived from the operation of PASCO under the guidelines.

During the marriage, Charles acquired a fifty percent (50%) partnership interest in White–Ellis Co. which purchased a parcel of real estate located in Greenwood, Indiana. For a while, PASCO occupied a portion of this property as a tenant. The property was also occupied by the business of Charles' partner [White] which was

a substantial customer of PASCO. PASCO could not operate profitably at this new, additional location and eventually vacated the premises. However, PASCO has continued to make rental payments to White–Ellis in the amount of $2,000.00 to $3,000.00 per month. The rent payments have been applied to the mortgage on the White–Ellis property resulting in a substantial reduction of the indebtedness on the real estate.

Anne argues the trial court erred by failing to include any amount for PASCO's payment of rent to White–Ellis in the calculation of Charles' income. Anne cites *Merrill*, 587 N.E.2d at 191, for the proposition that the payment of principal on business debts results in an increase in the payor parent's net worth and should properly be considered as income under the guidelines. We agree.

The ultimate effect of PASCO's payment to White–Ellis is that PASCO is purchasing for Charles his interest in the White–Ellis real estate. This transfer of wealth is tantamount to "in kind" compensation. The flow of funds from PASCO to White–Ellis increases Charles' net worth just as surely as if funds were being transferred into Charles' long term retirement account. Moreover, the White–Ellis partnership operates at a loss which produces tax savings for Charles. It would be unjust for Charles to enjoy these income-like benefits from the operation of business without any benefit inhering to the support of his children. Anne is correct: the trial court erred by failing to attribute income to Charles resulting from the benefits he receives from this transaction.

■ Charles has a revolving account with PASCO from which he can borrow money to pay his personal expenses. At the time of trial, the balance of this loan account was approximately $7,500.00. Charles is obligated to pay this money back to PASCO. Anne asserts the trial court erred by failing to consider the benefit Charles receives from having this line of credit from PASCO in the calculation of his income. We agree.

First of all, the record reveals that Charles does not pay interest on this debt. Charles' PASCO loan account ledger reveals that Charles receives a dollar for dollar credit against the loan balance for the payments he makes on the account. The ledger does not contain any indication that interest is accruing on the account nor has Charles ever asserted that he pays interest on his loans from PASCO. If Charles did not receive the benefit of free credit from PASCO and were required to finance a $7,500.00 balance on a credit card at 15% interest, his personal interest expense would come to $1,125.00 annually. While the computation of income for tax purposes is different from the instant computation of income for computing child support under the guidelines, Child Supp.G. 3.A.2., we would note that the IRS imputes income to loans made at below market rates of interest. 26 U.S.C. 7872(a)(2). In any event, the free credit that Charles receives from PASCO is significant, reduces his personal living expenses, and thus constitutes "in kind" compensation under Child Supp.G. 3.A.2.

■ More importantly, however, the precise method in which Charles draws funds from PASCO, whether it be by salary, loan, "in kind" compensation, or otherwise, is not directly related to or determinative of how his income is calculated under the Guidelines. As noted above, income from the operation of business as defined by Child Supp.G. 3.A.2. is related to the profitability of the business. It is an abuse of discretion for a trial court to permit a business operator to escape paying his share of child support by manipulating the manner in which he draws funds out of his business; e.g., by drawing out "loans" instead of salary. Similarly, it would be an abuse of discretion to permit the operator of a business to avoid paying child support by accumulating excess earnings unrelated to capital expenditures or any other reasonable business purpose.

Loans drawn from a corporation by the majority stockholder in charge of operations to pay his personal expenses in no way resemble the ordinary and necessary

expenses of a corporation or a reasonable out-of-pocket expenditure necessary for the production of income which are properly deducted from gross receipts in arriving at income under Child Supp.G. 3.A.2. Charles has withdrawn this money from PASCO and applied it toward the payment of his personal expenses just as if it were his salary. It would be against the logic and effect of the facts and circumstances not to consider Charles' PASCO average loan account balance in the determination of his income under the guidelines.

As noted herein, the calculation of the payor parent's income from the operation of a business is imbued with trial court discretion. *Cox*, 580 N.E.2d at 350. An attempt by the reviewing court to determine, with mathematical precision, the payor parent's income from the operation of a business would be an exercise in futility. *Id.* As noted above, the trial court erred in computing Charles' income by failing to apply the methodology prescribed by the guidelines. Therefore, we reverse and remand with instructions that the trial court calculate Charles' income under the methodology prescribed by Child Supp.G. 3.A.2. with the entry of findings, as required under T.R. 52, sufficient to support its calculation.

■■■ The child support guidelines give rise to a rebuttable presumption that the amount of award which results from an application of the guidelines is the correct amount of child support to be awarded. *Talarico v. Smithson* (1991), Ind.App., 579 N.E.2d 671. An obligor who seeks a deviation from the amount of child support determined by an application of the child support guidelines must present evidence such that the trial court can conclude that the guideline amount would be unjust or inappropriate under the existing circumstances. *Reeves v. Reeves* (1991), Ind.App., 584 N.E.2d 589, *trans. denied.* As Charles has not presented any evidence to support a deviation from the amount of child support resulting from an application of the guidelines (nor has he requested a deviation), a deviation from the guideline amount of support is not appropriate in the present case. Therefore, on remand, the trial court is instructed to use its new finding regarding Charles' income in its computation and order the amount of child support resulting from an application of the guidelines.

III.

JOINT LEGAL CUSTODY

Anne asserts the trial court erred in imposing an award of joint legal custody against her wishes. Specifically, she argues the trial court failed to support the award with findings based on the factors defined by Ind.Code 31–1–11.5–21(g) which are set out below.

■■■ Child custody determinations fall squarely within the discretion of the divorce court and will not be disturbed absent an abuse of discretion. *Aylward v. Aylward* (1992), Ind.App., 592 N.E.2d 1247. On review, we will not reweigh the evidence, judge the credibility of the witnesses, nor substitute our judgment for the trial court. *Id.* We will not reverse unless we find the trial court's decision is against the logic and effect of the facts and circumstances before the divorce court or the reasonable inferences drawn therefrom. *Id.*

Indiana Code 31–1–11.5–21 governs the disposition of child custody in dissolution actions. It reads, in pertinent part, as follows:

(a) The court shall determine custody and enter a custody order in accordance with the best interests of the child. In determining the best interests of the child, there shall be no presumption favoring either parent....

(b) Except as otherwise agreed by the parties in writing at the time of the custody order, the custodian may determine the child's upbringing, including his education, health care, and religious training, ...

* * * * * *

(f) The court may award legal custody of a child jointly if the court finds that an award of joint legal custody would be in the best interest of the child. As used in

this section, 'joint legal custody' means that the persons awarded joint custody will share authority and responsibility for the major decisions concerning the child's upbringing, including the child's education, health care, and religious training. An award of joint legal custody does not require an equal division of physical custody of the child.

(g) In determining whether an award of joint legal custody would be in the best interest of the child, the court shall consider it a matter of primary, but not determinative importance that the persons awarded joint custody have agreed to an award of joint legal custody. The court shall also consider:

(1) the fitness and suitability of each of the persons awarded joint custody;

(2) whether the persons awarded joint custody are willing and able to communicate and cooperate in advancing the child's welfare;

(3) the wishes of the child and whether the child has established a close and beneficial relationship with both of the persons awarded joint custody;

(4) whether the persons awarded joint custody live in close proximity to each other and plan to continue to do so; and

(5) the nature of the physical and emotional environment in the home of each of the persons awarded joint custody.

 We will affirm an award of joint legal custody imposed against the wishes of one parent if the parents have demonstrated a willingness and ability to communicate and cooperate in advancing the child's welfare. *Walker v. Walker* (1989), Ind.App., 539 N.E.2d 509, 513. We will reverse an award of joint legal custody when the award constitutes an imposition of an intolerable situation upon two persons who have made child rearing a battleground. *Aylward*, 592 N.E.2d 1247, 1252.

 In the present case, Charles and Anne each testified that they had no real disputes concerning the children during the separation period. Charles testified that in the event of a disagreement concerning the children, he would take into consideration the welfare of the children and back away from any disagreements. Charles testified that he had taken care of the children when Anne attended real estate school and also when she went out socially in the evenings.

Charles and Anne have demonstrated a sufficient willingness to communicate and cooperate in matters regarding the children. There is no evidence that the parents have made child rearing a battleground. Therefore, we conclude that the trial court abused no discretion in imposing an award of joint legal custody here. We have no way of knowing whether a particular joint legal custody arrangement will work or not, only time can tell. *Lamb v. Wenning* (1992), Ind.App., 591 N.E.2d 1031, *vacated on other grounds*, 600 N.E.2d 96. If a joint legal custody arrangement fails, it should be modified to a sole legal custody arrangement. *Id.*

## IV.

### THE CHILDREN'S PRESCHOOL TUITION AND PAROCHIAL SCHOOL EDUCATION

At the time of trial, Charles' and Anne's children were enrolled in a preschool which cost $115.00 per week. Charles and Anne agreed that the children should continue their attendance at this preschool as it was in their best interests. Also, Anne testified that it was her intention to send the children to a parochial school when they reach school age. Charles testified that he did not agree that the children should go to parochial school and that he thought they should go to public school.

Anne argues that the trial court erred by failing to enter sufficient findings regarding Anne's request for Charles' contribution to the children's pre-school tuition. Similarly, Anne argues the trial court failed to enter a finding pertaining to the parties' dispute regarding whether the children should be educated in a parochial or public school.

▮ The trial court imposed a joint legal custody arrangement upon this broken home and ordered that "[a]ny disputes between [Charles and Anne] concerning decisions related to the minor children are to be mediated through counselling ..." As set out above, Charles and Anne, as joint custodians of the children, *will share authority and responsibility* for the major decisions concerning the children's upbringing, including the children's education. See I.C. 31–1–11.5–21(f). The plain language of the statute mandates that the parents, not the courts, assume the authority to make the decisions regarding their children's education. Similarly, the statute mandates that the parents share the responsibility for such joint decisions; sharing responsibility certainly includes sharing the expenses related to the decisions regarding the children's education.

▮ It is up to the parents to make a joint legal custody relationship work. *Lamb*, 591 N.E.2d at 1034. It is inappropriate for joint legal custodians to seek the intervention of the divorce court to resolve their disputes regarding the major decisions of the children's upbringing. *Id.* Courts are incompetent to raise children and must not serve as the "referee parent" within a joint legal custodial relationship. *Id.*

▮ Anne and Charles, as joint legal custodians of their children, are on their own in raising their children and have been ordered to mediate their disputes through counselling. We find no error in the trial court's unwillingness to enter findings and/or orders on these matters.

Again we note that only time can tell if a given joint legal custody arrangement will work. *Id.* If Charles and Anne cannot resolve their disputes regarding their children's upbringing through mediation or otherwise, the joint legal custody arrangement should be modified to a sole legal custody arrangement. *Id.*

## V.

### DEPENDENCY TAX EXEMPTION

▮ The trial court ordered Anne to execute IRS Form 8332 to waive the dependency tax exemptions in favor of Charles "for all future years." Anne concedes the trial court has the authority to order her to execute a waiver of the exemptions, citing *Prenatt v. Stevens* (1992), Ind.App., 598 N.E.2d 616, *trans. denied.* She argues, however, that "the Internal Revenue Service interprets the execution of form 8332 for 'all future years' as non-revocable, ..." and therefore the trial court's allocation of the tax exemption "for all future years" is erroneous because it cannot be modified. (Anne's brief p. 49).

Anne has failed to cite authority which supports her assertion regarding the law of federal income taxation. Therefore, this purported error has been waived by operation of Ind.Appellate Rule 8.3(A)(7); *Keller v. State* (1990), Ind., 549 N.E.2d 372.

Moreover, our research has failed to reveal any indication that federal tax law would render the trial court impotent to modify its own order regarding the allocation of the dependency tax exemptions. The applicable regulation, Temp.Treas.Reg. § 1.152–4T (1984), reads in pertinent part as follows:

Q–4. For what period may a custodial parent release to the noncustodial parent a claim to the exemption for a dependent child?

A–4. The exemption may be released for a single year, for a number of specified years (for example, alternate years), or for all future years, as specified in the declaration. If the exemption is released for more than one year, the original release must be attached to the return of the noncustodial spouse and a copy of such release must be attached to his/her return for each succeeding taxable year for which he/she claims the dependency exemption.

Should Anne obtain a modification in the future which enables her to claim the dependency tax exemptions, Charles would simply be no longer able to claim the exemptions by filing IRS Form 8332 with the original release attached to his tax return. We see no impediment to a parent's ability

to claim a dependency exemption simply because she has waived the exemption in the past.

Child support orders are subject to modification regardless of whether crafted by the trial court or the parties and regardless of whether the order was intended to be forever determinative. *Halum v. Halum* (1986), Ind.App., 492 N.E.2d 30, 32–33, *trans. denied.* Thus, the trial court's order that Anne execute IRS Form 8332 to release the tax exemptions for "all future years" in favor of Charles is subject to modification and we find no error.

## CONCLUSION

We reverse and remand the property division and the child support portions of the dissolution decree with instructions that the trial court enter findings consistent with this opinion and modify its judgment accordingly. In all other respects, we affirm.

BAKER, J., concurs.

HOFFMAN, J., dissents in part and concurs in result in part with separate opinion.

HOFFMAN, Judge, dissenting and concurring in result.

I respectfully dissent as to Issues I and III, and I concur in result as to the other portions of the majority opinion. Although the majority correctly notes that the statute governing property distributions, IND. CODE § 31–1–11.5–11, would require inclusion of all the PASCO shares in the marital pot, to remand in the present case is to elevate form over substance. The trial court included detailed findings which would allow it to exclude the additional PASCO shares under IND.CODE § 31–1–11.5–11(b). The trial court's technical failure to include the shares in the marital pot, then immediately exclude them pursuant to statute should not require remand for such a finding. I would affirm the trial court's ruling on the property settlement.

However, I do not agree that the trial court's decision to award joint custody is supported by the record. As I have stated before, I continue to believe that the divisive nature of dissolution and custody proceedings requires the utmost caution prior to an award of joint custody. Here, one party expressly opposed joint custody which prompted a finding that difficulties with the custody decisions should be mediated. A finding that difficulties will in all likelihood arise, when coupled with the contested nature of the proceedings, portends future behavior inconsistent with joint custody.

Further, the party requesting joint custody stated that in the event of a disagreement, he would concede to avoid a conflict. On the surface this may seem laudable; however, such a stance flies in the face of a joint custody award. Discussion relevant to shared decisions is the cornerstone of joint custody. The party requesting joint custody has negated any reason for making such an award by indicating that he would not fully participate in the decision making. An award of joint custody in the present case does not serve the interests of the children by promoting joint effort, rather the award appears to placate the parties in that neither "loses" custody.