948 N.E.2d 380 (2011)
In re the PATERNITY OF A.S.,
B.M.S., Appellant-Respondent,
v.
E.M., Appellee-Petitioner.
No. 82A01-1006-JP-291.
Court of Appeals of Indiana.
May 24, 2011.
*381 Craig Goedde, Goedde Law Office, P.C., Evansville, IN, Attorney for Appellant.
Jean M. Blanton, Ziemer, Stayman, Weitzel & Shoulders, Evansville, IN, Attorney for Appellee.

OPINION
CRONE, Judge.

Case Summary
B.S. ("Father") and E.M. ("Mother") have one daughter, A.S. Father lives in Indiana, and Mother lives in Missouri. In December 2008, the parents agreed to divide parenting time equally, with A.S. alternating between her parents' homes on a weekly basis. After an exchange in April 2009, Mother noticed that A.S. had three bruises on her leg that Mother thought resembled a handprint. Thereafter, Mother refused to allow Father to exercise his parenting time. As a result, both parties petitioned the court for primary custody of A.S.
Several lengthy hearings were held. In addition to the issue of abuse allegations, the evidence outlined numerous disputes that the parents had had in regard to A.S.'s care. Several exchanges were contentious, as were communications between the parents. Father began recording telephone conversations in violation of the initial custody order. After the conversations were over, Father would rant about Mother and her family on the recordings. Two of these recordings were admitted over Father's objection that the parts that Mother did not hear were not relevant. Ultimately, the trial court gave primary custody to Mother and gave Father parenting time every other weekend.
On appeal, Father argues that the trial court abused its discretion by admitting the recordings, granting primary custody to Mother, and failing to sanction Mother for interfering with his parenting time. We conclude that the recordings, including the portions that Mother did not hear, were relevant to Father's attitude toward co-parenting. We also conclude that the trial court did not abuse its discretion by giving Mother primary custody because (1) there was overwhelming evidence that the parents cannot effectively co-parent; (2) the record supports the trial court's conclusion that Father was less willing to cooperate than Mother; and (3) the record supports the court's conclusion that A.S. would benefit from more time in Missouri because she could participate in educational programs on a consistent basis. Finally, we conclude that the trial court did not abuse its discretion by not finding Mother in contempt or ordering her to pay attorney fees because Father also violated court orders. However, Mother advances no reason why Father should not receive make-up parenting time. Therefore, we remand for the trial court to address the *382 issue of make-up parenting time, but affirm in all other respects.

Facts and Procedural History
On June 18, 2008, Mother filed a petition to establish paternity of A.S., who was born on August 27, 2007. Father filed a cross-petition to establish paternity and custody. On July 31, 2008, Father admitted paternity of A.S. Mother was given temporary custody, and Father received parenting time every other weekend. On December 22, 2008, the parties agreed to joint legal custody, with A.S. staying in each parent's care for a week at a time. As Mother lived in Eureka, Missouri, and Father lived in Evansville, Indiana, the parties agreed to make the weekly exchanges at a McDonald's in Mount Vernon, Illinois. The trial court issued an order incorporating the agreement and also ordered the parties to refrain from recording conversations.
On April 26, 2009, Father brought A.S. to Mount Vernon for the exchange. After the exchange, Mother noticed that A.S. had three bruises on her leg. Mother thought that the bruises resembled a hand print, and she became concerned that A.S. had been abused. On April 27, 2009, Mother took A.S. to Dr. Ted Green for her regularly scheduled wellness check. Mother showed the bruises to Dr. Green, but he could not definitively say that they had resulted from abuse.
On April 28, 2009, Mother filed a petition for a protective order in the Family Court of St. Louis County, Missouri, and she obtained a temporary order. However, Father was never served, and the record does not reflect that a hearing was held. Nevertheless, Mother told Father that she would not bring A.S. to Mount Vernon for the next exchange. When Father asked for an explanation, Mother would tell him only that "Missouri has jurisdiction." Tr. at 303. Mother offered to allow Father to visit A.S. in Missouri with her supervision; Father, who did not understand Mother's cryptic claim that Missouri had jurisdiction and was suspicious of her motives, declined to travel to Missouri.
On May 20, 2009, Father filed a motion titled "Emergency Petition for Custody or in the Alternative, Parenting Time and Order to Appear" in Vanderburgh Superior Court. Appellant's App. at 32. At a hearing on June 11, 2009, Mother filed a motion titled "Mother's Verified Petition to: (A) Modify Custody; (B) to Restrict Father's Parenting Time and Require Parenting Time to be Supervised; and (C) to Establish a Parenting Time Schedule for Father." Id. at 36. At this hearing, Father learned for the first time that Mother had been withholding parenting time because she believed that Father had abused A.S. The court ordered Father's parenting time to resume on June 21, 2009, and to be supervised by his parents.
While Mother asserts that she made a report to Vanderburgh County Department of Child Services ("VCDCS") prior to the June 11 hearing, VCDCS has no record of any contact with Mother until July 9, 2009. A caseworker interviewed Father, and a counterpart in Missouri interviewed Mother. The caseworker also reviewed Dr. Green's records and the photographs of bruises. The caseworker concluded that the bruises "appeared as though they were normal play injuries of a toddler" and classified Mother's allegations as unsubstantiated. Respondent's Ex. E. The caseworker completed her report on July 31, 2009.
A contested hearing on custody issues was set for January 22, 2010, and was continued on February 26, March 5, March 11, and March 12. The January 22 hearing was not recorded due to an equipment malfunction; therefore, the caseworker's *383 testimony and a portion of Mother's testimony are not included in the record before us. The parties have different recollections of what was said at that hearing, and each party has filed a motion to certify a statement of evidence, but to our knowledge, the trial court has not ruled on those motions.
The remainder of the transcript makes it clear that the effort to co-parent A.S. was fraught with conflict. The parents sought co-parenting counseling after the December 2008 custody order was issued, but that did little to reduce the level of hostility between the parents. The parents had difficulty agreeing on a time to schedule the counseling sessions. In addition, Mother claimed that she had to beg Father to tell her where the counseling would take place. Father claimed that he had attempted to relay that information multiple times, but Mother had hung up on him. Ultimately, the parents attended only three sessions together. The counselor interrupted one of the sessions to tell Father privately to stop "nit-pick[ing]" Mother. Tr. at 420. Even after counseling, the parents were unable to agree on a large variety of issues relating to A.S.'s care, including whether she should be tested and take medication for allergies, whether she should go to a dentist in Missouri or Indiana, how warm it should be before she stops wearing a winter coat, how often her hair should be cut, and whether she should be allowed to take a backpack back and forth between the parents' houses.
Mother's refusal to allow Father to see A.S. and to provide an explanation for her behavior appears to have deeply undermined Father's trust. Father began to record telephone conversations in violation of the court's order. At the conclusion of the calls, Father would continue the recording as he ranted about Mother and her family members. Two of the recordings were admitted into evidence over Father's objection that the parts of the recordings that Mother did not hear were not relevant.
Mother wrote Father several detailed letters about A.S.'s progress and inviting his input on a variety of issues. Father rarely responded to these letters because he believed that Mother was not sincerely interested in his input, but merely wanted to emphasize that A.S. was with her instead of him; however, Father continued to ignore many of Mother's letters even after his parenting time resumed. Father began documenting any bruises, scrapes, or injuries that A.S. arrived with or sustained while in his care. This included taking partially clothed pictures of A.S. in the bathroom of the McDonald's where the exchanges were made.
Several exchanges were problematic. In April 2009, Mother wrote Father to tell him that she would not be able to be present for the exchange, and she asked him to make the exchange with her parents. However, she later called Father and told him that she would be present. When Father arrived at the McDonald's in Mount Vernon, he discovered that Mother had sent family members to pick up A.S. and they had contacted the Mount Vernon police. Father testified that he showed the officer the custody order, and the officer then decided that Father was not required to make the exchange. Mother then left work and came to Mount Vernon to pick up A.S. Father refused to believe that Mother had been at work because she arrived wearing sweat pants.
On April 19, 2009, Mother took A.S. to Mount Vernon at 2:00, which was the time that they usually exchanged A.S. Father arrived at 7:00 because he believed that they had agreed to that time and that time was also consistent with the Parenting *384 Time Guidelines. As a result, both parties had to drive to Mount Vernon again the following day to make the exchange.
Father initially agreed to let Mother have A.S. the Saturday after Thanksgiving, but then backed out of the agreement because Mother upset him by calling relatively late in the evening to talk to A.S. Father offered to come to St. Louis on New Year's Eve in 2009 to spend time with A.S. if Mother did not have plans. Mother claims that she spent the day with A.S. and then went to work after A.S.'s bed time. Father claims that Mother actually left A.S. with a babysitter and went to a party.
Telephone calls to A.S. were also a source of conflict. Father wanted Mother to call around 5:30 to talk to A.S., but Mother often was at work at 5:30. Mother claimed that Father allowed her only a ten-minute window in which to call A.S. Father claimed that he allowed Mother to talk to A.S. at any time, although he was bothered when she called substantially later than 5:30. Father often wanted to talk to A.S. at length, but due to A.S.'s young age, she was not always able or willing to talk on the telephone for an extended period of time. Father claimed to make extraordinary efforts to get A.S. to talk to Mother on the telephone, but he claimed that Mother and her family interfered with his calls by distracting A.S., encouraging her to hang up, placing the telephone on mute, or simply walking away from the telephone.
Ultimately, the trial court concluded that custody should be modified so that Mother has primary custody of A.S. and Father has parenting time every other weekend. The court found that the parties were unable to co-parent effectively due to their hostility to each other, their inability to communicate, and their inability to resolve even minor conflicts without the intervention of the court. The court also noted that A.S. is involved with educational programs in Missouri, including Little Gym, where she participates in physical activities; Creative Expressions Learning Center, which is a preschool-like program with activities geared toward children under the age of three; and Parents as Teachers, where Mother is taught educational activities to do with A.S. The court found that A.S. enjoys these programs, but was unable to participate on the same schedule as other children due to the alternating parenting time schedule. Father now appeals.

Discussion and Decision
We begin by noting that the trial court issued findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52. Our standard of review is well settled:
First, we determine whether the evidence supports the findings and second, whether the findings support the judgment. In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. Challengers must establish that the trial court's findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced a mistake has been made. However, while we defer substantially to findings of fact, we do not do so to conclusions of law. Additionally, a judgment is clearly erroneous under Indiana Trial Rule 52 if it relies on an incorrect legal standard. We evaluate questions of law de novo and owe no deference to a trial court's determination of such questions.
*385 Johnson v. American Classic Mortg. Corp., 894 N.E.2d 268, 270 (Ind.Ct.App. 2008) (citation omitted).
Father argues that the trial court erred by (1) admitting the portions of his recordings that Mother did not hear over the telephone; (2) by awarding primary custody to Mother; and (3) by not sanctioning Mother for her interference with his parenting time.

I. Admission of Evidence
We review a trial court's admission or exclusion of evidence for an abuse of discretion. Dorman v. Osmose, Inc., 873 N.E.2d 1102, 1108 (Ind.Ct.App.2007), trans. denied. An abuse of discretion occurs if the trial court's decision is against the logic and effect of the facts and circumstances before the court. Id.
Father and several other witnesses testified that Father does not make derogatory comments about Mother in A.S.'s presence. Father also testified that he did not speak to Mother in a derogatory manner. Mother testified that he may have made some subtly negative comments. Father therefore argues that the portions of the recordings where he continued to speak after the call had ended should not have been admitted into evidence because they were irrelevant. See Ind. Evidence Rule 401 (relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"); Ind. Evidence Rule 402 (irrelevant evidence is inadmissible). In the alternative, Father argues that even if the recordings were relevant, they should not have been admitted because they were unduly prejudicial. See Ind. Evidence Rule 403 (relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice).
Two recordings, one from May 31, 2009, and one from August 28, 2009, were played on the record. The May 31 call occurred during the time that Mother was not allowing Father to see A.S. Father asked Mother if he would be able to see A.S. Mother said he could come see A.S. as long as she was present and then hung up. Father then said:
B* * * *. Oh, you didn't even hear that part did you? No, because you hung up the phone so fast. I tell you what, that slipped. . . . But you know what, it felt good. I have never cussed her on the phone like that to her face. . . . Maybe I ought to start saying that every time I talk to her.
Tr. at 617. He then listed accusations he thought Mother might make against him if he went to Missouri and concluded by saying, "You don't need to go to school to become a psychologist. All you need to do is talk to a family that's psychotic, start paying attention, start documenting, and you'll learn a whole hell of a lot." Id. at 619.
The August 28 call took place after Father began having supervised parenting time with A.S. Father called Mother to tell her that his parents were not able to come with him to pick up A.S. at the usual time, and he requested that the exchange be moved to 5:15 or later. Mother said that she would be unable to make the exchange that late in the day, but offered to have her parents drop off A.S. Father indicated that he would rather move the exchange to 2:00 the next day than make the exchange with Mother's parents. After the call concluded, Father called Mother and her family a variety of profane names. In addition, he stated:
And I'm not going to risk losing [A.S.] `cause I come over there and whip your a* *. Because trust me, pal, that's what *386 I want to do. I want to whip the hell out of you and your family right now. . . . It's time that you grow up and be a parent and be a mother. But you're not. You're always gonna be a biological mother `cause you gave birth, but you're never gonna be [A.S.'s] Mommy. . . . You want the attention, I'll give you attention. I'll give you attention when I come to your house and pull you out and whip your a* *. . . . There's no apparent talking to a b* * * *. That does not exist `cause the b* * * * don't understand. The b* * * * * does what she wants.
Id. at 525, 527-28.
Mother argues that the recordings are relevant because they are indicative of Father's attitude toward co-parenting. We agree. While the angry outbursts may have begun as Father's way of venting his frustration with Mother's interference with his parenting time, they continued after his parenting time resumed. In the August 28 call, Mother was nothing but accommodating, and Father chose to miss a portion of his parenting time rather than accept her proffered solution. Despite Mother's attempt to accommodate Father, his response after the fact was to let out an angry stream of insults, threaten Mother, irrationally claim that Mother does whatever she wants, and state his opinion that Mother would never be A.S.'s "Mommy." Id. Although none of these things were stated to Mother or A.S., his comments in the May 31 recording suggest that his restraint has its limits; in addition, Father admitted that in another recording, he stated that he would make sure that A.S. knows that she was kidnapped by her Mother. We also do not find the evidence unduly prejudicial, as there were numerous other instances of hostile and uncooperative behavior among the evidence before the trial court. The trial court did not abuse its discretion by admitting the recordings.

II. Modification of Custody
We have a particular preference for granting latitude and deference to trial judges in family law matters, and we review custody modifications for an abuse of discretion. Browell v. Bagby, 875 N.E.2d 410, 412 (Ind.Ct.App.2007), trans. denied. "The burden of demonstrating that an existing child custody arrangement should be modified rests with the party seeking the modification." Id. Indiana Code Section 31-17-2-21(a) provides:
The court may not modify a child custody order unless:
(1) the modification is in the best interests of the child; and
(2) there is a substantial change in one (1) or more of the factors that the court may consider under section 8 and, if applicable, section 8.5 of this chapter.
The factors listed in Section 8 are:
(1) The age and sex of the child.
(2) The wishes of the child's parent or parents.
(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
(4) The interaction and interrelationship of the child with:
(A) the child's parent or parents;
(B) the child's sibling; and
(C) any other person who may significantly affect the child's best interests.
(5) The child's adjustment to the child's:
(A) home;
(B) school; and
(C) community.
(6) The mental and physical health of all individuals involved.
(7) Evidence of a pattern of domestic or family violence by either parent.

*387 (8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(b) of this chapter.
Ind.Code § 31-17-2-8.
Father does not dispute that there has been a substantial change in circumstances; therefore, we will address only whether giving Mother primary custody was in A.S.'s best interest. Despite this concession, the dissent argues that the parents's inability to communicate is insufficient to warrant a change in custody. While that may be true in some circumstances, joint custody is difficult when the parents are able to communicate effectively and almost always detrimental to the wellbeing of the child when they cannot. The dissent apparently would restore the joint custody arrangement, a result that neither party requests. If joint custody continues, the parents's inability to cooperate will force the trial court to be the "tie breaker" in future disputes, something the dissent purports to want to discourage. There are times when a breakdown of communication between parents renders joint custody no longer in the best interests of the child. See Hanson v. Spolnik, 685 N.E.2d 71, 78 (Ind.Ct.App.1997) (although isolated acts of misconduct cannot serve as a basis for modification, a pattern of egregious behavior may, and trial court should not give joint custody "to parents who have made child rearing a battleground"), trans. denied; cf. Meade v. Levett, 671 N.E.2d 1172, 1178 (where father had primary custody of the children and both parents engaged in irritating conduct, trial court did not err by denying mother's petition to grant her sole custody of the children). In this case, the trial court has made such a finding and there is evidence to support that finding. The trial court is in a much better position to make this call than an appellate tribunal, and thus the deferential standard of review.
Rather than disputing that there is a substantial change of circumstances, the thrust of Father's argument is that Mother's behavior in relation to the abuse allegations demonstrates that she is not the appropriate party to have primary custody of A.S. The parents dispute Mother's level of culpability, and this issue is complicated by the fact that some relevant portions of the transcript are unavailable. Father notes that Mother did not promptly report her allegations to law enforcement or the Department of Child Services in Indiana or Missouri and did not seek a modification of custody until the day of the June 11, 2009 hearing. Father suggests that the protective order proceedings fizzled because Mother supplied an incorrect address for service, although she clearly knew his correct address. Father notes that Mother obfuscated the process by refusing to tell him why she was withholding parenting time other than to state (erroneously) that Missouri had jurisdiction. Father claims that Mother told the court that Dr. Green believed the bruises resembled a handprint and that she had already contacted authorities in both Indiana and Missouri, when in fact Dr. Green said that he could not definitively state that the bruises were a result of abuse, Mother never contacted the authorities in Missouri, and she did not contact VCDCS until after the hearing on June 11, 2009. In sum, Father argues that Mother did not sincerely believe that A.S. was abused, that she exaggerated the evidence to the trial court, and that she prevented him from having a timely opportunity to refute the allegations and resume parenting time with A.S.
Mother claims that an attorney whom she consulted in Missouri advised her to seek a protective order and to not discuss the case with Father or allow him to have *388 A.S. until there was a hearing on the protective order. Mother blames the lack of service on the sheriff, but admits that she did not attempt to have Father served. Mother agrees that Dr. Green's opinion was inconclusive and that she never contacted authorities in Missouri, and she claims that she did not testify otherwise.[1] Mother insists that she contacted VCDCS prior to the June 11, 2009 hearing and did not attempt to explain why VCDCS had no record of that contact. The only other evidence that Mother presented in regard to the abuse allegations was her mother's opinion that the bruises resembled a handprint.
The trial court found that no abuse had in fact occurred. As to Mother's culpability, the trial court found that Mother had acted on the advice of an attorney when she filed a petition for a protective order, but did not explicitly find that she had been advised to withhold parenting time or to prevent Father from discovering the allegations against him. Nor did the court make any findings as to whether Mother misled the court as to the weight of the evidence supporting her allegations at the time that the court initially entered the supervision order. The trial court is in a better position than we are to determine the sincerity of Mother's concerns.
Regardless of the level of Mother's culpability, we cannot say that the trial court abused its discretion by modifying the custody order to give Mother primary custody. There was overwhelming evidence that the parents are not able to effectively co-parent. Although both parents contributed to the breakdown of communication and there is plenty of blame to go around, the trial court found that Father demonstrated less willingness to cooperate than Mother. Father refused to make exchanges with Mother's relatives regardless of the circumstances. There was evidence that Mother's step-father had made some threatening statements, but Father was unable to offer any explanation why he would not make exchanges with Mother's mother or sister other than that he thought that Mother would "abuse[ ]" the arrangement; however, he was not able to give any reason why that arrangement would be detrimental to anyone involved. Tr. at 669. Father refused to respond to many of Mother's letters despite the fact that the co-parenting counselor had recommended that they communicate in writing to reduce hostility. Father insisted that Mother send the letters by certified mail, yet complained that it took too long to receive letters. Father continued to try to communicate by telephone and recorded the conversations in direct contravention of the trial court's order. The rants contained in these recordings shed additional light on his hostile and inflexible attitude. Father admitted that the co-parenting counselor told him that he needed to stop being so critical of Mother.
The trial court also based its decision on the fact that giving Mother primary custody would allow A.S. to enjoy Little Gym and the Creative Expressions Learning Center without interruption. Father does not dispute that A.S. enjoys these programs and benefits from them. For the foregoing reasons, we cannot say that the trial court abused its discretion by modifying the custody order.

III. Sanctions Against Mother
Father argues that the trial court should have held Mother in contempt for withholding parenting time, ordered her to pay attorney fees, and granted him make-up parenting time.
*389 Whether a person is in contempt of a court order is a matter left to the trial court's discretion, and we will reverse only where an abuse of discretion has been shown. Mitchell v. Mitchell, 785 N.E.2d 1194, 1198 (Ind.Ct.App.2003). The trial court found that both parties had violated court orders. Mother wrongfully withheld parenting time, and Father recorded telephone conversations and on a few occasions had people other than his parents provide supervision for his parenting time without notifying Mother or the court of the need for an alternate supervisor. The court could have properly found both parents in contempt; instead, it declined to hold either party in contempt and admonished both parties to seek appropriate legal redress instead of self-help in the event of future disputes. We cannot say that the trial court abused its discretion, as it treated both parties the same. See Van Wieren v. Van Wieren, 858 N.E.2d 216, 219, 222-23 (Ind.Ct.App.2006) (holding that trial court's decision not to hold mother in contempt was not an abuse of discretion because neither party was held in contempt and the record showed "troubling behavior on the part of both parties, including significant issues regarding communication about the children, a relentless pattern of parental alienation and derogatory comments made in front of the children, and allegations that [father] physically abused the children, though these allegations were later investigated and determined to be unfounded").
Indiana Code Section 31-17-7-1(a) authorizes the court to order a party to pay a reasonable amount to the other party of maintaining or defending child custody proceedings.
Additionally, trial courts enjoy broad discretion in awarding attorney fees, and reversal is proper where the trial court's award is clearly against the logic and effect of the facts and circumstances before the court. Also, when determining whether or not to award attorney fees, there are several factors that the trial court tends to weigh, such as the ability to pay fees based on earnings and whether fees and litigation expenses were incurred due to the adverse party's misconduct.
Carrasco v. Grubb, 824 N.E.2d 705, 712 (Ind.Ct.App.2005) (citations omitted), trans. denied. As discussed above, both parties violated court orders. We cannot say that the trial court abused its discretion by requiring the parties to bear the cost of their own attorney fees.
While the parties dispute the level of Mother's culpability in withholding parenting time, Mother does not contend that she was in fact legally permitted to do so. Mother does not respond to Father's argument that he should receive make-up parenting time, and we are aware of no reason why he should not receive it. In addition to the parenting time that Father missed as a result of the abuse allegations, there appears to be a dispute as to whether he received the appropriate amount of parenting time for his birthday, A.S.'s birthday, and Father's Day. Therefore, we remand to the trial court with instruction to determine how much make-up parenting time that Father is entitled to and when it should be exercised. We affirm in all other respects.
Affirmed in part and remanded.
NAJAM, J., concurs.
ROBB, C.J., concurs in part and dissents in part with separate opinion.
ROBB, Chief Judge, concurring in part and dissenting in part.
I concur in part and dissent in part. I concur with my colleagues' opinion regarding admission into evidence of recordings *390 made by Father, and regarding the trial court's decision not to hold Mother in contempt or order her to pay attorney fees. For two reasons I respectfully dissent, however, from my colleagues' opinion affirming the trial court's order modifying custody and granting primary custody to Mother. First, I believe that the trial court's specific findings as to the parties' reluctance to cooperate or communicate are insufficient to support modification of custody to grant primary custody to Mother. Second and similarly, I believe that despite the parties' difficulty cooperating and communicating, the trial court clearly erred in modifying custody, thereby discouraging the parties from finding a way to work out their differences and encouraging their continued immature behavior.
At the outset, both our role as the appellate court and the role of the trial court in custody modification proceedings bear repeating. I am mindful of the role of an appellate court and its standard of review. And, while we show great deference to trial judges in family law matters, Indiana law prohibits trial courts from modifying custody unless there is a substantial change in relevant circumstances such that modification is in the best interests of the child. Ind.Code § 31-17-2-21(a). Further, courts cannot modify custody as punishment for a parent's disobedience of a custody agreement. Meade v. Levett, 671 N.E.2d 1172, 1177 (Ind.Ct.App.1996). The proper inquiry "is not who would make the better' parent; rather, the focus is upon whether a substantial change in one of the factors relevant to the determination of a child's best interests has occurred." Joe v. Lebow, 670 N.E.2d 9, 22 (Ind.Ct.App.1996). At bottom, although we defer to the trial court's findings of fact, it is our role to ensure facts found are appropriate to be considered and support the judgment.
Regarding entry of original and modified custody orders, Indiana Code section 31-17-2-8 provides that trial courts "shall consider all relevant factors, including the following": the age and sex of the child, the wishes of the parents and child, the child's relationships, the child's environmental adjustments, the mental and physical health of all involved, evidence of a pattern of violence, and similar factors regarding a de facto custodian, if any.
Admittedly, the statutory list of factors is not exclusive, and we have repeatedly recognized as proper the consideration of other factors. However, the relevance of other considerations is limited to their present or reasonably predictable effect upon the child's welfare. See D.H. v. J.H., 418 N.E.2d 286, 291 (Ind.Ct.App.1981) (holding a court may not deprive a parent of custody for sexual misconduct unless the misconduct is "shown to have an adverse effect upon the welfare of the children"); accord DiStefano v. DiStefano, 60 A.D.2d 976, 977, 401 N.Y.S.2d 636 (N.Y.App.Div.1978). "Generally, lack of cooperation . . . cannot serve as a basis for the modification of child custody . . . . [although] a parent's . . . behavior towards another parent[] which places a child's welfare at stake[] can support" a modification order. Hanson v. Spolnik, 685 N.E.2d 71, 78 (Ind.Ct.App.1997), trans. denied; Meade, 671 N.E.2d at 1177 ("[C]ooperation or lack of cooperation is not an appropriate justification for a change in custody.").
This interpretation of Indiana law is supported by the principle of statutory construction known as ejusdem generis, which provides that "where words of specific and limited signification in a statute are followed by general words of more comprehensive import, the general words shall be construed as embracing only such persons, places, and things as are of like *391 kind or class to those designated by the specific words, unless a contrary intention is clearly shown by the statute." Consol. Rail Corp., Inc. v. Lewellen, 682 N.E.2d 779, 783-84 (Ind.1997) (citation omitted). In accordance with this rule of statutory construction, I would conclude that the phrase "all relevant factors" in Indiana Code section 31-17-2-8 includes only considerations that directly involve the child's welfare, be it mentally, emotionally, or physically. Although this might appear to significantly narrow the scope of permissible trial court considerations in determining or modifying custody, I believe it appropriately places the focus on the best interests of the child. It follows that trial courts may consider parental disputes only to the extent that they directly affect the best interests of the child.
My colleagues base their decision on the trial court's findings regarding the parents' tantrum-type pattern of communication and lack thereof, Father's apparently negative "attitude toward co-parenting," op. at 386, Father's verbal outbursts outside the presence of Mother and A.S., a general conclusion that "Father demonstrated less willingness to cooperate than Mother," id. at 388, Father's inability to articulate how he perceived the possibility of returning to joint custody following contentious modification proceedings, tr. at 669-70, and a finding that A.S. "would benefit from more time in Missouri because she could participate in educational programs on a consistent basis," op. at 381. These reasons for modification do not constitute a substantial change in relevant circumstances and are not directly related to a child's best interests. Cf. Ind.Code § 31-17-2-8(1)-(8).
The trial court concluded there was a substantial change in circumstances, but did not specify what this change was. The trial court recounted the parties' difficulty communicating and cooperating, and even opined that additional co-parenting counseling would benefit the parties and A.S. The trial court restated Mother's allegation of Father's abuse and specifically found that it did not occur. The trial court described A.S.'s educational programs in Missouri and found that Father was exploring similar programs in Indiana, but prohibited Father from enrolling A.S. in such programs and seems to have granted Mother primary custody so that A.S. could participate in the Missouri programs more consistently.
While Father demonstrated less willingness to cooperate than Mother, this fact is not determinative because both expressed some reluctance and neither demonstrated an absolute inability to cooperate for the best interests of A.S. Mere reluctance to cooperate as co-parents, however tragic, does not necessarily affect the best interests of the child. See Hanson, 685 N.E.2d at 78. In other words, evidence that one parent has no interest in dealing with the other, standing alone, is not evidence of a substantial change in relevant circumstances that would directly affect the best interests of the child.
Further, the majority concedes there is "plenty of blame to go around." Op. at 388. In fact, it appears Mother "started it"that is, the pattern of antagonistic communication by both Mother and Father which is well-documented in the record. The majority notes that "Mother's refusal to allow Father to see A.S. and to provide an explanation for her behavior appears to have deeply undermined Father's trust." Id. at 383. Therefore, aside from the frequent minor disputes, Mother initially escalated the mutual hostility by withholding A.S. from Father, which apparently significantly damaged the trust Father had in Mother. This led to Father's frustration, reluctance to co-parent, tr. at 669-70, and *392 anger that he expressed verbally outside the presence of A.S. The majority emphasizes the trial court's role in determining the sincerity of Mother's concerns, but her sincerity is not at issue. Rather, the issue is the agitating manner in which Mother handled her concerns, both before and after she learned the truth that Father had not abused A.S.
In addition, I believe courts should modify custodial relationships onlyas directed by statute and case lawwhen a substantial change in circumstances has placed the welfare of the child at risk.
It is up to the parents to make a joint legal custody relationship work. It is inappropriate for joint legal custodians to seek the intervention of the divorce court to resolve their disputes regarding the major decisions of the children's upbringing. Courts are incompetent to raise children and must not serve as the "referee parent" within a joint legal custodial relationship.
McGinley-Ellis v. Ellis, 622 N.E.2d 213, 224 (Ind.Ct.App. 1993) (citations omitted), affirmed in relevant part and vacated on other grounds, 638 N.E.2d 1249, 1253 (Ind. 1994); see Walker v. Walker, 539 N.E.2d 509, 513 (Ind.Ct.App.1989) ("We have no way of knowing whether this [joint custody] arrangement will work or not; only time can tell.").
I repeat here the wisdom our court has acknowledged, albeit in a different context, regarding why courts should encourage parents to work out family disputes:
We must realize that, by allowing [families] to rely on the courts to settle such disputes, we deprive families of the opportunity to work out their problems and be the shapers of their own destinies. To the extent that we usurp the natural functions of the family unit including handling fallings outwe put an obstacle in the path of reconciliation rather than removing one. By acting as we do, we assume the responsibility for the decisions that would be made entirely internally in a family if it were still intact. If warring family members can blame the court, they will be less likely to recognize and acknowledge their own culpability. Without a feeling of responsibility for, or participation in, either the decision or the result, there is less incentive for the individual family members to improve relations.
McKay v. McKay, 644 N.E.2d 164, 167 (Ind.Ct.App.1994) (quoting Milne v. Milne, 383 Pa.Super. 177, 556 A.2d 854, 856 (1989)) (alteration omitted).
The record reveals childish and emotional over-reactions by both Mother and Father, reluctance to cooperate by both Mother and Father, and dreadful communication by both Mother and Father. Despite Mother's allegation of abuse that initially ratcheted up hostility between the parties, the trial court found that no abuse had in fact occurred. Neither party behaved appropriately. The trial court found that "[b]oth parties clearly love their daughter." Appellant's Appendix at 10. They must now learn to get along to communicate and cooperate with each other as co-parents.
Allowing modification of custody in favor of one whose misbehavior has led to the supposed "substantial change," Ind.Code § 31-17-2-21(a)(2), in circumstances rewards misconduct and should therefore be avoided. Meade, 671 N.E.2d at 1177. Even if neither party requests maintenance of joint custody, courts make decisions by applying law and public policy to facts, and in this case doing so should have led to denial of both parties' requests to modify custody. See McClanahan v. Breeding, 172 Ind. 457, 88 N.E. 695, 697 (1909) (stating that public policy is a question of law).
*393 The trial court's order for Father not to cut A.S.'s hair without Mother's permission because Mother wanted to donate A.S.'s hair to Locks of Love, see Appellant's App. at 15, is precisely the type of "referee parent[ing]" that our trial courts should not engage in. McGinley-Ellis, 622 N.E.2d at 224. This is detrimental to the courts because doing so encourages "tattle-tale" behaviorknown in other contexts as frivolous litigationand will ultimately be detrimental to A.S., who will perpetually be surrounded by quibbling and over-reactive parents.
The trial court's order itself indicates an intention to remain a referee in this householdit suggested continued co-parenting counseling; prohibited Father from enrolling A.S. in educational programs without prior court approval; and made highly specific orders regarding how the parties are to communicate, exchange A.S., behave at A.S.'s extracurricular events, and manage their own and others' comments about each other in the presence of A.S. It is likely that Mother and Father will dispute whether the other actually abides by the order, which enables them to run to the newest volunteer refereethe courts. The primary custody order may change the nature of the court involvement but it will certainly not end it.
Even aside from the specific relatively minor parts of the trial court order, modification of custody to grant primary custody to Mother all but guarantees extensive future court involvement. Father will likely continue to seek ways to meaningfully remain a part of A.S.'s life. Although the same might be said in many custody modification cases, this social-impact view is especially relevant here because the trial court did not identify a substantial change in circumstances and there is no evidence that modification is in the best interest of A.S. As stated above, I believe courts should modify custodial relationships only when a substantial change in circumstances has placed the welfare of the child at risk. For these reasons, I would reverse the trial court's order modifying custody, reinstate joint custody, order joint counseling, and encourage the parties to work out their differenceslarge and smallfor the sake of A.S., whom they both apparently love very much.
NOTES
[1] The parties do not dispute that Dr. Green's medical records did not express any concern about abuse or that Dr. Green did not make a report of suspected child abuse.