# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 12 2018, 6:05 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Dan J. May
Kokomo, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Rachelle (Purcell) LaMonde, *Appellant-Petitioner*, | October 12, 2018 |
| | Court of Appeals Case No. 34A02-1711-DC-2534 |
| v. | Appeal from the Howard Superior Court |
| Gary Purcell, *Appellee-Respondent*. | The Honorable Brant J. Parry, Judge |
| | Trial Court Cause No. 34D02-1701-DC-24 |

**Brown, Judge.**

[1] Rachelle (Purcell) LaMonde ("Mother") appeals the trial court's order denying her petition to modify custody. She raises eight issues which we consolidate and restate as:

I. Whether the trial court erred in calculating Father's income;

II. Whether the trial court abused its discretion in modifying Mother's parenting time; and

III. Whether the trial court abused its discretion in denying Mother's request to conduct an *in camera* interview of her child, E.P.

We affirm in part, reverse in part, and remand.

### Facts and Procedural History

[2] Mother and Gary Purcell ("Father") had children including N.P., born in 1994, Al.P, born in 1999, Am.P., born in 2000, and E.P., born in 2006.[1] In May 2010, Mother filed a verified petition for dissolution of marriage. In July 2011, Michael P. Krebes filed a guardian ad litem report.[2] On February 11, 2013, the

---

[1] The February 11, 2013 Settlement Agreement/Waiver of Final Hearing states that "there were four (4) children born of the marriage, namely, [N.P.] (DOB 09/03/94), [Al.P.] (DOB 01/24/99), [Am.P.] (12/14/00) and [E.P.] (4/26/06), and [Mother] is not now pregnant or incapacitated." Appellant's Appendix Volume II at 46. Mother answered affirmatively when asked if "it's actually [G.A.] II, we call him [Al.], is that correct?" Transcript Volume II at 98. Mother testified that she had five children with Father and, when asked for their names and ages, Mother answered: "[J.], 27, [N.], 22; [Al.], however, yeah, you mentioned already, [G.A.P.] the III, 18; [Am.], 16; and [E.], 11." *Id.* at 101. During redirect examination, Mother was asked: "[Al.] is out of the mix. I said [Al.], sorry. It's actually it's [Al.] the III, isn't it?" *Id.* at 125-126. Mother answered, "Right." Mother answered affirmatively when asked if Al.P. was "out of the mix." *Id.* at 126. In its August 21, 2017 order from which Mother appeals, the trial court orders that Father shall continue to have primary custody of Al.P., Am.P., and E.P. At one point in its order, the court mentions Am.P. and G.

[2] In her brief, Mother states that the guardian ad litem report was filed with the trial court on April 1, 2011. The chronological case summary indicates that the report was filed in July 2011.

trial court entered a Settlement Agreement/Waiver of Final Hearing ("Agreement") which stated that Mother and Father would have joint legal custody of their children, that Father would have primary custody of Al.P., Am.P., and E.P., and that they would reside with Father. The Agreement stated that Mother would have no less than 150 overnights per year, that she would exercise primary physical custody with respect to N.P., and that Father agreed to pay Mother "$150.00 retroactive to February 1, 2013 . . . with each party to pay $700.00 in annual uninsured medical expenses for the children in their primary care [and] the 6% rule and percentages shall apply." Appellant's Appendix Volume II at 48. The Agreement also provided that Father would maintain a health and dental insurance policy on the minor children so long as it remained reasonably accessible to him by his employer.

[3] On December 23, 2014, Father filed a Petition for Emancipation alleging that N.P. would be twenty-one years old in September 2015 and requesting that his support be terminated with respect to her. On January 26, 2015, Mother filed a Motion for Rule to Show Cause for Contempt of Court Motion to Impose Criminal/Civil Sanctions asserting that Father failed to pay pursuant to the existing educational order with respect to N.P., that he failed to pay for the 2013-2014 and 2014-2015 school years, and that he was $10,000 in arrears. On January 29, 2015, Mother filed a Petition to Modify Custody Parenting Time alleging that conditions and circumstances had changed and that the best interests of the children would be served if she were granted custody due to "the Father's refusal to provide insurance cards and VA college benefit

information." *Id.* at 72. The court ordered the parties to submit the matters to mediation and scheduled a hearing for April 2, 2015.

[4] On March 20, 2015, Mother filed a motion alleging that Father refused to pay certain amounts. On March 27, 2015, Father filed a Petition to Modify Custody and Support requesting that he have legal and physical custody of the minor children.

[5] On July 30, 2015, the court held a hearing. On November 16, 2015, it entered an order which concluded that Mother's claim to set aside the Agreement based upon allegations of fraud failed, that Father's obligation to pay for N.P.'s post-secondary expenses was included in his weekly support amount of $150 per week for the time N.P. has and will attend I.U.K., and that his obligation continues until N.P. completes an aggregate of eight full-time semesters. The order also provided that the agreed upon support amount of $150 per week is an acceptable and appropriate deviation of the Guideline support amount, that Father was not in contempt for failing to pay $5,000 per academic year toward N.P.'s educational expenses, and that Mother was not in contempt for her failure to have certain mortgages on rental properties refinanced.

[6] Mother appealed and argued that the trial court erroneously denied her direct challenge to the Agreement, erroneously concluded that N.P.'s attendance at I.U.K. is "off-campus" for purposes of the Agreement, and that Father was estopped from arguing that he was not obligated to pay $5,000 per year in N.P.'s sophomore through senior years at I.U.K. *Purcell v. Purcell*, No. 34A02-

1602-DR-253, slip op. at 2-3 (Ind. Ct. App. October 14, 2016). We held that the trial court erred in concluding that Father's $5,000 yearly educational support obligation to N.P. ceased when she transferred to I.U.K. *Id.* at 3. We reversed and remanded with instructions to order Father to satisfy his remaining post-educational support obligations to N.P. *Id.* at 9.

[7] Meanwhile, on November 13, 2015, Mother filed an emergency petition.[3] An entry in the chronological case summary ("CCS") dated November 23, 2015, states: "Counsel for [Mother] requests an In-Camera Interview of the minor child. Counsel for [Father] objects. Court grants request and schedules an In-Camera Interview for November 24, 2015 at 3:45 p.m. Counsel is permitted to be present. Court takes this matter under advisement." Appellant's Appendix Volume II at 17. That same day, Mother's counsel filed a "Motion for Court to Take Judicial Notice of the Common Definition of Corporal Punishment and/or Spank." *Id.* A CCS entry dated November 24, 2015, states that the court conducted an *in camera* interview "of the minor child." *Id.* On November 30, 2015, the court denied Mother's petition for emergency custody and indicated that it would schedule a hearing on pending petitions.

[8] On October 18, 2016, Mother filed a Motion for Rule to Show Cause for Contempt of Court [and] Motion to Impose Criminal/Civil Sanctions for

---

[3] The record does not contain a copy of Mother's November 13, 2015 petition. Mother characterizes the petition as one for emergency custody, and the chronological case summary characterizes the petition as one to modify support orders.

Failure to Pay Child Support asserting that Father failed to pay the existing support order, that his last payment was made on May 18, 2016, and that he was in arrears in the amount of $3,450 as of October 17, 2016. On April 19, 2017, the court held a hearing. Mother testified that Father did not pay $5,000 for N.P.'s sophomore or junior years, that Father stopped paying support of $150 on May 20, 2016, and that it would be fair to say that Father had approximately $70,000 in wages and approximately $15,000 in rental income. Father testified that he had three rental properties, that he stopped paying $150 per week on May 20, 2015 after N.P. graduated, that he was not sure if he was behind in the $150 payments, and when asked how he could be current in those payments, he answered: "Because I have other children that were given to me that I'm trying to provide for." Transcript Volume II at 52.

[9] On March 16, 2017, Father filed a request for an *in camera* interview. On March 20, 2017, Mother also filed a request for an *in camera* interview.[4] On May 22, 2017, the court entered an order which in part found Father to be in indirect contempt for his failure to pay child support as ordered.

[10] On July 6, 2017, the court held a hearing on the pending issues. At the beginning of the hearing, the court stated:

> [I]n speaking with counsel in chambers, I'm going to take judicial notice of the Guardian Ad Litem reports that have been filed previously in the case. As we discussed in there the weight I give

---

[4] The March 2017 requests for *in camera* interviews are not included in the record.

that report, given his age, is something that I'll make a decision on after hearing all the evidence.

*Id.* at 79.[5]  Mother's attorney asserted: "My only objection is based on, I think it's irrelevant and immaterial because there's a decree since.  Anything that happened prior, I don't know what the real world is [sic]."  *Id.*  The court stated:

> As I indicated, it'll go to the weight given the age of it and the fact that subsequent to the Guardian Ad Litem Report the parties entered into an agreement on how to resolve the matter so that's (inaudible).  If there are any issues that are really bothersome to someone I doubt they would have just put those aside and entered into an agreement so it'll go to the weight.  Other than that we also, the fact that the parties agreed, that the court will listen to the emergency custody hearing from Circuit Court that took place in 2015, I believe, instead of rehashing all of that evidence today again, correct?
>
> [Mother's Counsel]:  Yes.  The only supplement I did not have at the emergency hearing, well, -

*Id.* at 79-80.

[11]  Mother indicated that there had been constant problems with Father "not allowing [her] to have a say so in treatment" of the children's mental and physical health.  *Id.* at 83.  She testified that E.P. had welts on her rear end and she took her to a doctor, and that Father interfered with her right to have the

---

[5] The record does not contain a copy of the guardian ad litem reports.

doctor treat E.P. by grabbing a paper away from the receptionist. The court indicated that it would listen to the hearing regarding the emergency petition.

[12] Howard County Sheriff's Detective Rodney Shaffer testified that he investigated an incident involving E.P. in November 2015. Detective Shaffer testified that he interviewed E.P. When Mother's counsel asked Detective Shaffer for E.P.'s story, Father's counsel objected on the basis of hearsay. Mother's counsel asserted that E.P. was present, that she could testify, and that it was an excited utterance. The court sustained the objection. Detective Shaffer testified that he talked to Mother, talked to Father who ultimately referred him to his attorney who did not reciprocate his attempts at communication, and submitted the case to the prosecutor's office, and that nothing resulted.

[13] Father testified that Al.P., Am.P. and E.P. were living with him. He admitted to striking E.P. with a glue stick in November 2015 and considered leaving welts on a young girl's buttocks and/or legs appropriate punishment. He testified that he and Mother agreed on how they would use corporal punishment and what they would use and that they had "done it with every single one of [their] children." *Id.* at 224.

[14] After the parties rested and after some discussion, the following exchange occurred:

> [Mother's Counsel]: In camera interviews, yes/no?
>
> THE COURT: The only one we have left is –
>
> [Mother's Counsel]: [E.P.].

THE COURT:  - [E.P.].  You asked for [Al.P.], too, didn't you, [Father's Counsel]?

[Father's Counsel]:  I asked for [Al.P.], yes.

THE COURT:  I'm not going to talk to [E.P.].  I think it's - , I think I don't need to talk to either one of them.

[Mother's Counsel]:  OK.

Transcript Volume III at 38-39.

[15]  The court also stated that it did not "want to have all these different child support obligations worksheets" and asked the parties to "sit down and do your calculations together." *Id.* at 41.  The court stated: "It makes it a lot more difficult when everybody has different numbers and I'm not sure where they all came from." *Id.*  Mother's counsel responded: "[Father's counsel is] very cooperative, he's always been very cooperative.  We'll get it done." *Id.*  The court gave the parties until July 21, 2017, to submit their child support calculations.

[16]  On July 21, 2017, Father filed a Brief Regarding Modification of Custody and Support.  A CCS entry dated July 24, 2017, states that Mother's counsel filed a "Fax; Affidavit of [Mother's counsel]; and supporting documents."  Appellant's Appendix Volume II at 29.  A CCS entry dated July 26, 2017, states that Mother filed a "Motion to Strike/Response to Brief of Respondent, Supplemental and Re-newed [sic] Motion for Sanctions and Fees." *Id.*

[17] On August 21, 2017, the court entered a Parallel Parenting Plan Order, which provides:

> The Court finds and concludes the parties are high conflict parents, as defined in the Indiana Parenting Time Guidelines. The court finds high conflict because of the following behavior(s):
>
> a. A pattern of ongoing litigation;
>
> b. Chronic anger and distrust;
>
> c. An inability to communicate about the children in that the Father has not had a verbal conversation with the Mother about their parenting time arrangement in years, and;
>
> d. An inability to cooperate in the care of the children.
>
> The Court DENIES the Petition to Modify Custody filed by the Mother. The Father shall continue to have primary custody of [Al.P.], [Am.P.], and [E.P.].
>
> The parties shall continue to share joint legal custody . . . .
>
> Now therefore, accordingly, the court deviates from the Indiana Parenting Time Guidelines and now Orders the following Parallel Parenting Plan:
>
> 1. **RESPONSIBILITIES AND DECISION-MAKING**
>
>> 1.1 Each parent has a responsibility to provide for the physical and emotional needs of the child. Both parents are very important to the child and the needs of the child. Both parents are very important to the child and the child needs both parents to be active parents throughout their lives. Both parents must respect each parent's separate role with the child. Each parent must put the child's needs first in planning and making arrangements involving the child.

1.2     When the child is scheduled to be with the Father, then Father is the "on duty" parent. When the child is scheduled to be with the Mother, then Mother is the "on duty" parent.

1.3     The on-duty parent shall make decisions about the day-to-day care and control of the child.

* * * * *

2. **REGULAR PARENTING TIME**

2.1     The parents shall follow this specific schedule so the children understand the schedule.

2.2     Father has the physical custody of the children. The non-custodial parent shall have regular contact with the children as listed below:

> [Al.P.] and [Am.P.]: Every other weekend, from 6:00 p.m. on Friday until 6:00 p.m. on Sunday.

> [E.P.]: on the same schedule as had been in use since the Decree was entered. The non-custodial parents shall exercise a minimum of 150 overnights per year.

> All children: Alternate holidays per Section 4.

3. **SUMMER PARENTING TIME**

3.1     The extended summer parenting time as described in the IN-PTG shall not apply. The alternate weekend schedule shall continue throughout the year for [Al.P.] and [Am.P.]. The parenting schedule with [E.P.] shall continue as it was previously ordered and as it has been exercised in the years since the Decree was entered.

4. **HOLIDAY SCHEDULE**

4.1     Holiday Schedule Priority.  The below detailed holiday schedule overrides the above Regular Parenting Time Schedule.  For listed holidays other than Spring Break and Christmas Break, when a holiday falls on a weekend, the parent who is on-duty for that holiday will be on-duty for the entire weekend unless specifically stated otherwise.  It is possible under some circumstances that the holiday schedule could result in the child spending three (3) weekends in a row with the same parent.

* * * * *

## 18.  CHILD SUPPORT AND ARREARAGE / OVERPAYMENT

18.1    Pursuant to the original child support order [Father] was ordered to pay $150.00 per week.  From the date of that order (February 1, 2013) through March 26, 2015, the date [Father] moved for a modification of custody and support, [Father] owed $16,800.00 in child support.

18.2    Herein, the Court has denied [Mother's] request to modify custody.  However, the Court does find that support should be modified retroactive to March 27, 2015 with [E.P.] visiting 150 nights per year and [Al.P.] and [Am.P.] visiting on alternating weekends (98 overnights).

18.3    Pursuant to the attached child support obligation worksheets (A-1 and A-2), from March 27, 2015-July 20, 2017, [Father] should have been paying $85.00 per week in child support.  The total owed during this time period equals $10,030.00.  For these support calculations, the Court imputed $290.00 per week as [Mother's] income and $1,305.00 per week as [Father's] weekly income as derived from his 2016 tax return.  [Mother] was visiting

with [E.P.] for 150 overnights per year, and with [Am.P.] and [G.][6] for 98 overnights per year.

18.3[7] The total amount of support owed by [Father] from February 1, 2013 through July 20, 2017 equals $26,830.00.

18.3 According to the clerk's records, from February 1, 2013 through July 20, 2017, [Father] paid $26,850.00 in child support. Therefore, [Father] has overpaid child support in the amount of $20.00 as of July 20, 2017.

18.3 Pursuant to the attached child support obligation worksheets (B-1 and B-2), beginning July 21, 2017, and pursuant to the Parenting Time Schedule as indicated above, [Father] is ordered to pay child support in the amount of $120.00 per week. For these support calculations, the Court imputed $290.00 per week as [Mother's] income and $1,592.00 per week as [Father's] weekly income as derived from recent paystubs.

18.4 The Court will enter an income withholding order as submitted by [Father's] counsel in the amount of $120.00 per week.

Appellant's Appendix Volume II at 32-40. Mother filed a motion to correct errors, which the court denied.

## Discussion

[18] Before addressing the issues raised by Mother, we note that Father did not file an appellee's brief. When an appellee fails to submit a brief, we do not

___

[6] The trial court's order refers to G., but it appears the court intended to refer to Al.P.

[7] The order numbers multiple paragraphs as 18.3.

undertake the burden of developing arguments, and we apply a less stringent standard of review; that is, we may reverse if the appellant establishes *prima facie* error. *Zoller v. Zoller*, 858 N.E.2d 124, 126 (Ind. Ct. App. 2006). This rule was established so that we might be relieved of the burden of controverting the arguments advanced in favor of reversal where that burden properly rests with the appellee. *Wright v. Wright*, 782 N.E.2d 363, 366 (Ind. Ct. App. 2002). Questions of law are still reviewed *de novo*. *McClure v. Cooper*, 893 N.E.2d 337, 339 (Ind. Ct. App. 2008).

[19] Where, as here, the court entered findings sua sponte, such findings control only as to the issues they cover, and a general judgment will control as to the issues upon which there are no findings. *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997). When a trial court has made findings of fact, we apply the following two-tier standard of review: we determine whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions thereon. *Id.* Findings will be set aside if they are clearly erroneous. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Id.* A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. *Id.* To determine that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made. *Id.* "A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence." *Id.*

I.

[20] The first issue is whether the court correctly calculated Father's income. Mother challenges the trial court's calculation with respect to Father's retirement withholdings, credit for health insurance, and rental income. With respect to Father's retirement contributions, we observe that in *Saalfrank v. Saalfrank*, we held:

> [I]n determining whether to exclude retirement contributions, in whole or in part, for purposes of calculating a child support obligation, the trial court should consider:
>
> (1) a parent's control of whether or in what amount a retirement contribution is made;
>
> (2) the parents' established course of conduct in retirement planning (prior to and after the dissolution);
>
> (3) the amount of the contribution (from nominal to a large amount that could suggest the inappropriate sheltering of income);
>
> (4) whether and to what extent there are incentives for the contribution;
>
> (5) whether the contribution qualifies for favorable tax treatment;
>
> (6) whether continuing the contribution, in whole or in part, would otherwise reduce the amount that a child in the intact home could expect to receive; and
>
> (7) any other relevant evidence.

899 N.E.2d 671, 680 (Ind. Ct. App. 2008). Mother neither discusses nor develops an argument related to the factors. We cannot say that Mother has

demonstrated that the trial court erred with respect to Father's retirement contributions.

[21] To the extent Mother challenges the trial court's credit for Father's payment for the cost of insurance for the children, we note Father's testimony that he provided Mother with a copy of the insurance card and that she acknowledged that he had insurance through his employer. The record reveals that the trial court gave the parties until July 21, 2017, to provide their child support calculations, Mother's counsel indicated that Father's counsel had been very cooperative, and that they would "get it done," and that Father filed a Brief Regarding Modification of Custody and Support on July 21, 2017. Transcript Volume III at 41. The Table of Contents of Mother's Appendix lists "7/20/2017 [Father's] Proposed CSOW Forms" as appearing at pages 123-126, which include worksheets designated as Exhibits C, D, E, and F. The worksheet attached to the court's order has an Exhibit E sticker and includes an adjustment under Father's column for a weekly health insurance premium of $13.57. The record does not contain a copy of Father's July 21, 2017 Brief or any information regarding the different worksheets. We cannot say that Mother has demonstrated error with respect to the court's calculation of a credit for health insurance.

[22] As for Father's rental income, Child Support Guideline 3(A) provides that "'weekly gross income' is defined as actual weekly gross income of the parent if employed to full capacity, potential income if unemployed or underemployed, and imputed income based upon 'in-kind' benefits." Under the Indiana Child

Support Guidelines, "[w]eekly Gross Income from self-employment, operation of a business, rent, and royalties is defined as gross receipts minus ordinary and necessary expenses." Child Support Guideline 3(A)(2). Father testified that his "basic income" was $67,000 a year for the last three years. Transcript Volume II at 60. He indicated that the income from his rental properties might be about $9,000 to $10,000, that two of his rental units were not rented at the time of the hearing, and that he was attempting to sell those. His individual income tax returns list $10,190 as rental real estate income in 2015 and $9,959 as rental real estate income in 2016. Father's 2016 Schedule E lists three properties. Based upon the record, we conclude that Mother demonstrated that the trial court's failure to include rental income in the calculation of Father's income for purposes of calculating child support constituted *prima facie* error.

II.

[23] The next issue is whether the trial court abused its discretion in modifying Mother's parenting time. Mother argues that Father offered no evidence or valid reason to restrict or reduce her parenting time with Al.P. and Am.P. from the previously agreed upon overnights of 150 per year to 98 per year. Mother argues that there is no finding that it was in the best interests of the children that her parenting time be reduced or that the parenting time might endanger the children's physical health or significantly impair their emotional development. She contends that she is entitled to make-up time with the children due to Father's unilateral refusal to comply with the agreement.

[24] A decision about parenting time requires us to "give foremost consideration to the best interests of the child." *Perkinson v. Perkinson*, 989 N.E.2d 758, 761 (Ind. 2013) (quoting *Marlow v. Marlow*, 702 N.E.2d 733, 735 (Ind. Ct. App. 1998), *trans. denied*); *see also* Ind. Code § 31-17-4-2 ("The court may modify an order granting or denying parenting time rights whenever modification would serve the best interests of the child. However, the court shall not restrict a parent's parenting time rights unless the court finds that the parenting time might endanger the child's physical health or significantly impair the child's emotional development."). Parenting time decisions are reviewed for an abuse of discretion. *Perkinson*, 989 N.E.2d at 761.

[25] With respect to the court's order to provide Mother with parenting time for Al.P. and Am.P. every other weekend, we find that the court failed to articulate how the parenting time modification would serve the children's best interests. Likewise, it did not make the necessary finding that Mother's parenting time might endanger the children's physical health or significantly impair their emotional development. Under these circumstances and recognizing that Father did not file an appellee's brief, we remand for the trial court to determine and make one or more findings as to whether the children's health or safety would be endangered or whether there would be significant impairment of their emotional development by allowing Mother parenting time, as previously exercised. *See Hatmaker v. Hatmaker*, 998 N.E.2d 758, 761 (Ind. Ct. App. 2013) (noting that "[e]ven though the statute uses the word 'might,' this Court has previously interpreted the language to mean that a court may not restrict

parenting time unless that parenting time 'would' endanger the child's physical health or emotional development").

[26] As for Mother's request for make-up parenting time, we note that Father testified that Mother sent him an email stating that the children could come alternate weekends, that Mother sent another email saying it was time to resume the Agreement's stated parenting time schedule, that he did not follow that request, and that it was fair to say that Am.P. and Al.P. did not visit Mother as originally agreed. We remand for the trial court to consider Mother's request for make-up time. *See In re Paternity of A.S.*, 948 N.E.2d 380, 389 (Ind. Ct. App. 2011) (observing that mother did not contend that she was legally permitted to withhold parenting time, mother did not respond to father's argument that he should receive make-up parenting time, and remanding to the trial court with instruction to determine how much make-up parenting time that father was entitled to and when it should be exercised); *see also* Parenting Time Guidelines Section I(C)(2) ("If an adjustment results in one parent losing scheduled parenting time with the child, 'make-up' time should be exercised as soon as possible. If the parents cannot agree on 'make-up' time, the parent who lost the time shall select the 'make-up' time within one month of the missed time.").

III.

[27] The next issue is whether the trial court abused its discretion in denying Mother's request to conduct an *in camera* interview of E.P. Mother argues that

she was denied the right to have E.P.'s wishes considered because the court waited until the close of evidence to deny the parties' request to determine E.P.'s wishes in an *in camera* interview. Mother argues that the trial court's consideration of the 2011 guardian ad litem report was contrary to law and an abuse of discretion because the report was six years old and contained stale information of conditions existing in 2011 which would have little or no bearing on custody.

[28] The decision whether to conduct an *in camera* interview is within the trial court's discretion. *Cunningham v. Cunningham*, 787 N.E.2d 930, 937 (Ind. Ct. App. 2003). A trial court abuses its discretion in making a ruling if the decision is clearly against the logic and effect of the circumstances before the court, or if it misinterprets or misapplies the law. *Wright v. Mount Auburn Daycare/Preschool*, 831 N.E.2d 158, 162 (Ind. Ct. App. 2005), *trans. denied*.

[29] While Mother filed a request for an *in camera* interview, Mother did not object or express concern regarding the trial court's decision not to conduct an *in camera* interview of E.P. Rather, when the court stated that it was not going to talk to E.P., Mother's counsel responded, "OK." Transcript Volume III at 39. Further, Mother makes no claim that she was unable to call E.P. as a witness. Indeed, Mother's counsel stated at one point: "[E.P.'s] here. She can testify." Transcript Volume II at 201. We cannot say that the court abused its discretion.

## *Conclusion*

For the foregoing reasons, we affirm the trial court's calculations with respect to Father's retirement accounts and healthcare expenses and its decision not to conduct an *in camera* interview of E.P. We reverse the court's calculation with respect to Father's rental income and its reduction of Mother's parenting time of Am.P. and Al.P., and order the court on remand to make the necessary findings concerning Mother's parenting time and to consider Mother's request for make-up time and enter an appropriate order.

Affirmed in part, reversed in part, and remanded.

Bailey, J., and Crone, J., concur.